W. L. FLEISHER & COMPANY, Appellant, v. F. L. CORNWELL.—43 S. W. (2d) 423.

Court en Banc, November 17, 1931.

*Jourdan & English* for appellant.

*Leahy, Saunders & Walther* and *Lyon Anderson* for respondent.

RAGLAND, J.—The petition in this case seeks in six counts to recover on as many promissory notes, each for the sum of $1041.66, with six per cent per annum interest from December 1, 1924. The answer alleges that each of said notes was given in part payment for a certain air-cooling apparatus to be installed by plaintiff in a motion-picture theatre operated by defendant, with respect to the efficiency of which when installed plaintiff made certain warranties, and that by reason of plaintiff's breach of said warranties the said notes and each of them were without consideration. Under a counter-claim filed in connection with the answer defendant seeks to recover from plaintiff for the alleged breach of warranty the sum of $6249.96. In the trial court the jury found for defendant on plaintiff's cause of action and also on defendant's counterclaim. Judgment was entered accordingly, and plaintiff appealed.

The facts giving rise to this controversy will be briefly outlined. In the early summer of 1924, defendant as lessee was operating the Delmonte Theatre in the city of St. Louis. In view of the approaching heated season he set about to have installed in the theatre building an efficient cooling system, whereby the air therein would be materially reduced in temperature and then satisfactorily distributed to the various parts of the auditorium. To that end he entered into negotiations with the American Carbonic Machinery Company, a Wisconsin corporation, engaged in the business of manufacturing and installing refrigeration plants, and plaintiff corporation, the business of which was the manufacture and installation of devices for conditioning and distributing the air when cooled by means of

a refrigeration plant. The representatives of the two corporations together made a survey of the building and collaborated in drawing plans and specifications for a proposed cooling system as a unit. But defendant entered into a separate contract with each. Under the contract entered into with the American Carbonic Machinery Company it was "to furnish and install a complete carbonic safety system of refrigeration for the purpose of cooling water and air for the air conditioning system to be installed by the W. L. Fleisher & Co.. Inc." That with plaintiff required it to furnish and install an apparatus that would efficiently distribute the air when cooled to various parts of the theatre building. Both contracts were presented to defendant for signature at the same time and both became effective on or about June 3, 1924.

On July 28, 1924, each of the companies notified defendant that its part of the work had been completed according to its contract. Thereafter various tests were made from time to time as to the efficiency of the cooling system as a whole, none of which showed that it met the requirements of the contracts. Fnally, on November 20, 1924, plaintiff and defendant entered into a written contract which supplemented and in some respects modified the original contract between them of June 3, 1924. The provisions of the final contract having a direct bearing on the questions calling for decision are as follows:

"Guaranties:

"With the operating conditions herein specified fulfilled and while the system is supplied continuously with water and electric current and refrigeration effect as furnished by the American Carbonic Machinery Company, we will guarantee the following:

"1. That the temperature at the exhaust grilles will not be over 80 degrees F. when the outside dry bulb temperature is 90 degrees F.

"2. That the temperature at the exhaust grilles will not be over 73 degrees F. when the outside dry bulb temperature is 80 degrees F.

"3. That the relative humidity will not be over sixty per cent at 80 degrees or sixty-five per cent at 73 degrees under the conditions specified above. It is understood that the conditions in the theatre will be better than those given above, as the exhaust air carries all the heat and moisture given up by the people, but in so specifying, we are aiming to guarantee something which can be easily determined. . . .

"Additional Guarantees: In addition to the temperature and humidity guarantees given in our main contract of June 3, 1924, we will guarantee that the extreme dry-bulb temperatures on the main orchestra floor from the inside of the parapet wall to the front of the stage will not at the same time have a greater difference than

3½ degrees F. from the mean temperature on the main orchestra floor as above specified. This extreme variation will be smaller in average summer weather.

"Temperatures will be taken four feet above the main auditorium floor and among the seats. The temperatures so taken will not in any case be greater than the temperature guaranteed in our contract of June 3, 1924, which specifies that such temperatures shall be taken at the exhaust grilles.

"It is understood that 'the outside dry bulb temperature' which is referred to in clauses 1 and 2 of the 'Guarantees' of the June 3 contract shall mean a temperature to be taken over and four feet above the sidewalk at the Delmar Boulevard curb line at a point fifty feet west of the Clara Avenue west curb; at least one hour after sundown, by a certified thermometer which is completely protected from direct radiation from objects outside of the thermometer enclosure.

"The test and guarantees herein shall be effective only when the system is operated according to our instructions and with one hundred twenty-five tons of refrigeration effect per twenty-four hours, measured at thirty atmospheres, suction pressure, delivered to the cooling coils.

"It is agreed that the acceptance test will be conducted by the Terrell Croft Engineering Company of University City, Missouri, or in the event that the Terrell Croft Company is in any way incapacitated to act, then in that event by such other engineer as both parties to this contract may agree upon and that the finding of such engineer shall be binding upon all parties hereto. . . .

"In the event that this equipment on the official test does not fulfill such operating guarantees as are herein give, then we shall be given a reasonable opportunity to make such changes as we may deem necessary. If after reasonable time has been given not exceeding one year from date of completion of erection, to make such alterations, the system continues to fail to fulfill these operating guarantees on official test, then we will refund all moneys paid to us on account of the installation and will remove the apparatus and material furnished by us from your premises, thereby terminating this contract and all responsibility of either party for damages for any causes whatsoever. . . .

"It is further agreed that upon the execution of this contract by all parties hereto that the said F. L. Cornwell will issue to the W. L. Fleisher Company, Inc., twelve promissory notes payable monthly, the first note to be dated December 1, 1924, payable one month after date and each succeeding note one month later, so that the entire contract shall be paid in full by January 1, 1926. All of said notes shall bear interest at the rate of six per cent per annum."

The American Carbonic Machinery Company's contract with plaintiff provided:

"The refrigerating plant to be of a capacity of 125 tons rated at twenty-five degrees above zero (Fahrenheit) gas and shall deliver refrigerating energy equivalent to this capacity to the cooling coils of the air washers, as further outlined in this specification."

Following the signing of the supplemental agreement of November 20, 1924, in June, 1925, plaintiff, under the direction and supervision of Mr. Terrell Croft of the Terrell Croft Engineering Company, set about to make its air cooling and distributing apparatus fulfill the guarantees of the contract. Changes, modifications and additions, in connection with the tests, were made from time to time during the summer of 1925. None of these tests showed that the system as a unit complied with the contracts. The test which showed the nearest approach to a fulfillment of the required conditions, and which seems to have been the last one, was made August 6, 1925. With respect to that test Mr. Croft, who at the time of the trial was in Yucatan, testified by deposition as follows:

"The conditions—or guarantees—called for in the American Carbonic Machinery contract were not satisfied because the guaranteed refrigeration was not produced at the guaranteed electric power consumption and suction pressure. The conditions—or guarantees —called for' in the W. L. Fleisher contract were not satisfied because the average temperature in the theatre auditorium was not quite as low as the guaranteed average temperature. The average temperature was, in the August 6, 1925, test, for example, almost as low as the guarantee, but not quite. In the August 6 test it lacked but six-tenths of a degree of satisfying the guarantee. There may be other minor particulars in which the guaranteed performances were not satisfied."

Defendant read as a part of the deposition of Croft a letter written by him to plaintiff with reference to the test made August 6, which was in part as follows:

"The average inside auditorium temperature, as shown by the above readings, was 77 degrees, whereas to satisfy the contract, with the outside dry bulb at 85 degrees, this average inside temperature would have to be 76.4. So it is evident that the terms of the contract are not quite satisfied by these readings. That is, we should have an average inside temperature of 76.4 degrees, whereas we actually got an inside temperature of 77 degrees.

"But we have no assurance that the refrigeration equipment was delivering 125 tons when these readings were taken. In fact, there is every reason to believe that it was delivering something less than 125 tons. We did not make a refrigeration-output test. . . .

"It appears quite probable that if 125 tons of refrigeration are

delivered with 30 atmospheres back pressure, that the auditorium temperature guarantees can be satisfied. . . .

"I don't see how it will be possible to clean the thing up until the refrigeration outfit actually delivers 125 tons.

"Our recording thermometer is still installed at the Delmonte Theatre and I have loaned a sling psychrometer to Katzung, who is the operating engineer. He promises to take readings every night, so we will have a continuous record of performance. But all of this is worthless and getting us nowhere until we get 125 tons refrigeration."

Defendant testified that following the making of the test last referred to Croft verbally reported to him that the temperature was reduced to within six-tenths of a degree of the prescribed maximum, but under forced conditions; that "the condensers were packed in ice so they could force it to the fullest extent; running the fans around 80,000 feet;" and that as a working proposition it was not satisfactory.

Two witnesses called by the defendant, Wiel and Werner, were permitted to testify over the vigorous objections of plaintiff that they visited the Delmonte Theatre in the summer of 1925 and that during such visits they were unable to distinguish any difference between the temperature outside the theatre and the temperature inside the theatre—that it was not very comfortable inside.

Defendant paid six of the twelve notes he gave plaintiff; these payments constitute the basis of his counterclaim.

The cause was submitted to the jury upon the following instructions given at the request of the defendant:

"1. The court instructs the jury that if they believe and find from the evidence that the notes sued upon were given in consideration of theater-cooling equipment agreed to be furnished and installed by plaintiff; and if the jury further believe from the evidence that the said equipment and installation did not conform to the requirements of the contract read in evidence and that the guaranties made in said contracts were not fulfilled, and that the consideration for the said notes failed, then the jury will find for defendant on each of the six counts of plaintiff's petition.

"2. The court instructs the jury that if they believe and find from the evidence that the cooling equipment shown in evidence to have been furnished by plaintiff did not comply with the requirements or fulfill the guaranties made in the contracts of June 3, 1924, and November 20, 1924, read in evidence, and if the jury further believe and find from the evidence that the Terrell Croft Engineering Company did decide and determine that the guaranties and requirements of said contract had not been fulfilled; and if the jury

further believe and find from the evidence that defendant fully performed said contracts on his part, then the jury will find in favor of defendant on his counterclaim and will assess his damages at such sum as the jury may believe and find from the evidence defendant paid to plaintiff on account of the contract purchase price of said cooling equipment, not exceeding the sum of $6,249.96 and interest on the amount so found from December 21, 1926, at the rate of six per cent per annum.''

All of the instructions requested by plaintiff were refused, and among others the following:

''I. If you find and believe from the evidence that the sole cause of the failure, if any, to produce the temperature guarantees of the contracts was the failure, if any, of a third party to produce the specified refrigeration effect (if you find there was such failure), then defendant cannot recover on the counterclaim.

''J. You are cautioned that under the contracts introduced in evidence plaintiff was not obligated to install any refrigeration nor to guarantee the effective operation of whatever refrigeration was installed and the guarantees of plaintiff are based upon the refrigeration effect produced or to be produced by the American Carbonic Machinery, a third party.''

As heretofore stated the jury found for the defendant on both the cause of action alleged in the petition and the counterclaim.

The refusal of the trial court to give instructions ''I'' and ''J,'' heretofore set out, is one of the rulings of which appellant complains. The first advised the jury that if the sole cause of the failure to produce the temperature guarantee was the failure of a third party to produce the specified refrigeration effect, the defendant could not recover on the counterclaim. The second cautioned the jury that plaintiff was not obligated to install any refrigeration nor to guarantee the effective operation of refrigeration produced or to be produced by the American Carbonic Machinery Company. Appellant bases its contention that the refusal of the instructions was error on the rule of law that the buyer of a chattel cannot defeat recovery of the purchase price, nor recover damages from the seller, on the ground that there has been a breach of an express warranty, unless it be shown that all conditions precedent in the covenant have been fulfilled—the contract in the instant case plainly disclosing that a specified refrigeration effect was such a condition precedent.

It was the theory of respondent, as disclosed by his pleading and the presentation of his defense and counterclaim in the trial below, that his contract with appellant and the one with the American

Carbonic Machinery Company in reality constituted but a single contract, that the undertaking of the Machinery Company in the one and that of appellant in the other were the joint undertakings of both. This theory, though stoutly opposed by appellant, was adopted by the trial court. It is true that the two contracts were drawn with reference to each other; each is a complement of the other; the several performances of both, taken together, were designed to produce a single instrumentality, an air conditioning and cooling system. It is also true that certain provisions of the contract between respondent and appellant are incorporated by reference into the contract between respondent and the Machinery Company. But a careful reading of the contracts fails to disclose anywhere, either in express terms or by implication, a joint undertaking to do anything. The part of the cooling system to be furnished and installed by each of the contractors is specifically described and set forth in its contract with appellant, and nowhere in either contract is there any assumption by the contractor of responsibility for the other's performance of his contract. The two contracts are clearly separate and independent obligations, though designed to accomplish a single objective. That appellant did not assume any responsibility for the construction and installation of the refrigeration plant plainly appears from the condition which it expressly annexed to its warranty in the modified or final contract, namely: ''The test and guarantees herein shall be effective only when the system is operated according to our instructions and with one hundred twenty-five tons of refrigeration effect per twenty-four hours, measured at thirty atmospheres, suction pressure, delivered to the cooling coils.''

Appellant's warranty as to temperatures was not unqualified and absolute: it was conditional. It warranted that its apparatus would produce the specified relative temperatures inside the theatre auditorium, only when the system was operated with one hundred and twenty-five tons of refrigeration effect per twenty-four hours, measured at thirty atmospheres, suction pressure, delivered to the cooling coils. The existence of the specified refrigeration effect was therefore a prerequisite to appellant's liability for breach of the warranty. [Monks v. Miller, 13 Mo. App. 363; Tower v. Pauley, 76 Mo. App. 287; 2 Williston on Contract, secs. 664 and 666a.] In the language of the cases it was a condition precedent the fulfillment of which it was incumbent upon respondent, who averred a breach of the warranty, to allege and prove. [Chapman v. Ferguson, 152 Mo. App. 84, 132 S. W. 284; Nichols-Shepard Co. v. Rhoadman, 112 Mo. App. 299, 87 S. W. 62; 2 Williston on Contracts, sec. 674.] This he did not do. On the contrary the evidence tends to show that the condition as to the refrigeration never at any time existed. Appellant did not ask a directed verdict; it assumed that the issue of whether there

was a breach of warranty was for the jury. With respect to such issue it was clearly entitled to have had given its instructions "I" and "J." Their refusal by the court was error.

The contract prescribed the test for determining the efficiency of the cooling system and the exact manner in which it should be made; it also designated the person who should make the finding as to whether the operation of the system met the test; and provided that his finding should be final and conclusive with respect thereto. The testimony of the witnesses Wiel and Werner was therefore incompetent; it had a tendency to mislead and confuse the jury; its admission was error.

The judgment of the circuit court is reversed and the cause remanded. All concur.