Paul VENIE and Winifred Metzger, Plaintiffs-Respondents,

v.

SOUTH CENTRAL ENTERPRISES, INC., a corporation, Defendant-Appellant.

No. 8446.

Springfield Court of Appeals.

Missouri.

March 22, 1966.

James H. Keet, Jr., Theodore C. Salveter, Jr., Lincoln, Haseltine, Keet, Forehand & Springer, Springfield, for defendant-appellant.

Paul L. Bradshaw, O. J. Taylor, Neale, Newman, Bradshaw, Freeman & Neale, Springfield, for plaintiffs-respondents.

HOGAN, Judge.

This is an action for breach of an express warranty made by the defendant corporation in connection with the sale of a chemical weed killer. The cause was tried to the court without the intervention of a jury, and the plaintiffs had judgment for $3,539.98. The defendant has appealed.

At the time in question, the plaintiffs were raising strawberries commercially on a small tract of land owned by Mrs. Metzger. Mr. Venie is her nephew, and during the period involved here they operated under an informal partnership agreement whereby Mrs. Metzger furnished the land and Mr. Venie was in charge of cultivation. The extent of Mr. Venie's formal or technical education is not shown, but he had been "in the strawberry growing business" since 1937, and said he was "versed in the raising of crops, [but was] not a chemist."

The defendant corporation is, among other things, a retail supplier of agricultural chemicals. Mr. Dave Archer, the defendant's protagonist in this controversy, was the corporation's "Divisional Merchandising Manager, Chemicals": he was employed to sell agricultural chemicals, including herbicides. Mr. Archer has received the bachelor's and master's degrees in Agricultural Education from the State University; he has taught Vocational Agriculture and has done "some work" with "strawberries and all fruits" at the State Fruit Experiment Station.

Weeds, in Mr. Archer's words, are "the big problem with strawberries." Weed infestation not only prevents or impedes the growth of strawberry plants by competing with them for moisture and nourishment, but makes the berries difficult to pick. During the 1961–1962 growing season, the plaintiffs were having trouble with weeds, and their efforts to control them led to this action.

To conserve space, we will not recite the evidence concerning the parties' dealings in detail. The gist of plaintiffs' claim was that Mr. Venie informed the defendant through Mr. Archer that he needed a herbicide which, if properly applied, would control the weeds in his strawberry patches without damage to the plants themselves. The plaintiffs' position was—and their proof tended to show—that Mr. Archer attempted to locate a suitable preparation and finally sold them a chemical weed killer known as 2, 4, 5–T upon an express oral warranty that if it was properly applied it would kill the weeds and would be "perfectly safe for strawberries." Their evidence was further that they did apply the herbicide by conventional methods, as directed by the defendant, but that the 2, 4, 5–T not only destroyed the weeds but most of the strawberry plants as well. The defendant, while it generally admitted making the sale and the fact of damage, categorically denied making any warranty and maintained that if the 2, 4, 5–T had been properly applied at a time when the strawberry plants

were dormant, there would have been no damage whatever.

The case has been briefed and argued by both parties with exacting attention to detail. Each emphasizes a different aspect of Rule 73.01(d),[1] which defines the extent of appellate review in court-tried cases. As the appellant says, Rule 73.01(d) contemplates a review of the whole case upon its merits, and not a mere determination whether the trial court's findings are supported by substantial evidence. Further, the deference accorded the trial court's findings is precisely that, and not a matter of constitutional or statutory inhibition. Cross v. Gimlin, Mo., 256 S.W.2d 812–813 [2, 3]; Redden v. Boehmer, Mo. App., 223 S.W.2d 127, 129 [1, 2]. On the other hand, where the evidence is conflicting and close, and particularly where the decision depends upon conflicting oral testimony and the credibility of witnesses, the appellate court should generally defer to the findings of the trial court unless it is satisfied they should have been otherwise. Leggett v. Missouri State Life Insurance Co., Mo., 342 S.W.2d 833, 850 [2]; In re Petersen's Estate, Mo., 295 S.W.2d 144, 148 [3]. And an ancillary proposition which the appellant impliedly recognizes is that in reviewing a court-tried case the appellate court will not be particularly concerned with the reasons assigned by the trial court as long as it has reached a correct result. Edgar v. Fitzpatrick, Mo., 377 S.W.2d 314, 318 [12]; Producers Produce Co. v. Industrial Commission, 365 Mo. 996, 1004, 291 S.W.2d 166, 170 [1]; Brewster v. Terry, 352 Mo. 967, 972, 180 S.W.2d 600, 602 [1]. With these rules in mind, we approach the defendant's assignment that the plaintiffs made no case either upon an express or implied warranty. The appellant also contends that the plaintiffs made no case upon any theory of negligence, but that is not really germane to this appeal, for the plaintiffs state their theory as being one of express oral warranty and argue the sufficiency of their evidence primarily from that viewpoint.

The first of defendant's specific contentions is that Mr. Archer made no statement which could be considered as a positive assertion of fact. The evidence material to this assignment is that in searching out a suitable herbicide Venie asked Archer "how I could cure henbane and clover in strawberries with a spray that would be absolutely harmless to a berry plant as 24D or Craig would. But 24D or Craig would not cure henbane." Mr. Archer was unable to recommend anything with that degree of selectivity but advised Mr. Vanie he would look into the matter. Apparently the two discussed this matter on several occasions, and, at least as Venie recalled, in January 1962 Archer said "he had come up with a chemical that he had read about that would control both of them, both the weed and the clover." Mr. Venie's testimony was that when he asked if the chemical was "as safe as the other things I had been using," Archer answered, "Yes, use it; it is perfectly safe for strawberries." On cross-examination, Mr. Venie repeated essentially the same testimony—that he had not asked for a guarantee but only if the spray Mr. Archer had in mind was safe to use, and "he [Archer] told me he had a product, contained 2, 4, 5–T, that would control the henbane and clover and would be harmless to strawberries." The plaintiffs also introduced in evidence a pamphlet sent to Venie by Archer in response to Venie's request for information. The pamphlet, which was prepared at the State University, purports to recommend chemicals suitable to control weeds in fruit crops. On the first page, the pamphlet bears Mr. Archer's notation, "Paul, see last page." The last page, under the general heading "Strawberries (continued) Special Weed Problems," lists chemicals recommended for the control of chickweed and henbit in strawberry patches, and bears the notation "Also 245–T." This

1. All references to statutes and rules, unless otherwise noted, are to RSMo (1959), V.A.M.S. and V.A.M.R.

was sent to Mr. Venie in January 1962 prior to the purchase of the weed killer.

 While this summary of the evidence on this particular point—that there was no specific representation amounting to a warranty—is admittedly incomplete, we believe the most that can be said is that there was a disputed factual question whether Mr. Archer, knowing the plaintiffs' special needs, represented that the spray he sold Mr. Venie was a selective weed killer which would control weed growth without damage to the strawberry plants. That question could have been resolved either way, depending upon whether the trial court chose to believe Mr. Venie or Mr. Archer. It may be that Mr. Archer did not intend his statements to constitute an express warranty, and that he did not, as counsel argues, use the word "guarantee," but the creation of an express oral warranty, at least under the law applicable here, did not require the use of any particular term or technical words, but only that there be a positive affirmation or representation of fact by the seller relating to the subject matter of the sale. Turner v. Central Hardware Co., 353 Mo. 1182, 1189, 186 S.W.2d 603, 606–607 [5–7], 158 A.L.R. 1402, 1408. No specific intention was required on the seller's part other than to make a positive affirmation of fact, Charles F. Curry and Company v. Hedrick, Mo., 378 S.W.2d 522, 536 [16]; Turner v. Central Hardware Co., supra, 353 Mo. at 1192, 186 S.W.2d at 608 [14], 158 A.L.R. at 1410, and indeed the existence and nature of an express warranty vel non was a matter of inference from the language used, considering the surrounding circumstances. Stone v. Farmington Aviation Corp., 363 Mo. 803, 807, 253 S.W.2d 810, 812 [2, 3].

The defendant also maintains that because Venie was equally as familiar with the properties of 2, 4, 5–T as Archer, the record furnishes no basis for a finding that the plaintiff reasonably relied on Mr. Archer's representation, even if one was made. In support of this argument, the appellant cites, among other cases, Dotson v. International Harvester Co., 365 Mo. 625, 285 S.W.2d 585. That case involved a claim for breach of warranty concerning a two-row tractor-drawn corn planter. One of the buyers' numerous claims in that case was that they told the defendant they "wanted a corn planter that would plant this corn nine inches apart, and that we could use at high speed, and that would put the fertilizer down in the same operation." The defendant had then said, "[T]his planter will be especially suitable for your use." The plaintiffs maintained that this representation constituted an express warranty of fitness for a particular purpose. In commenting upon the inferences reasonably permissible from the facts, the court held, 365 Mo. at 635, 285 S.W.2d at 590, that inasmuch as both parties were farmers, and the defendant had no special knowledge or skill the plaintiffs did not also have, " * * * these parties stand upon an equal footing and it is not possible to find or infer that [plaintiffs] justifiably relied upon Mr. Croll's superior knowledge and experience, or upon any promissory representations he may have made respecting the corn planter."

 The defendant's point is not without force. Mr. Venie was an experienced strawberry grower; he had been "in the strawberry business" since 1937. He "[had] studied it * * * [tried] to keep up with it at least, [tried] to be very familiar with it." He subscribed to and read periodicals dealing with his trade. He was familiar with spraying techniques and had admittedly used or tried preparations chemically similar to 2, 4, 5–T. And it is true, as the appellant says, that reliance upon the affirmation of fact or representation claimed to be a warranty is one of the elements of a cause of action for breach of the warranty, and the plaintiff had the burden of proving it. Turner v. Central Hardware Co., supra, 353 Mo. at 1191, 186 S.W.2d at 608 [12], 158 A.L.R. at 1410; 1 Williston, Sales, § 206, p. 534 (Rev. ed. 1948); 77 C.J.S. Sales § 310, pp. 1143–1144. The requirement of reliance, however, has several

aspects and must be considered and applied in context. Usually the requirement of justifiable reliance is discussed in connection with a claim of implied warranty of fitness for a particular purpose, 1 Williston, Sales, § 235, pp. 607–610, though in the absence of a statutory definition, the division of warranties into express and implied has been inexact, 1 Williston, Sales, § 194, p. 499, and we decline any attempt to distinguish the two precisely. In any event, we cannot read into the Dotson case, supra, any requirement that the buyer's reliance on the seller's skill and judgment be a total and complete reliance, and the fact that Venie had tried some chemical herbicides and was familiar with spraying techniques would not, in our opinion, bar his recovery. Turner v. Central Hardware Co., supra, 353 Mo. at 1190, 186 S.W.2d at 607 [8], 158 A.L.R. at 1408; Hagedorn v. Taggart, D.C.Mun. App., 114 A.2d 430, 432 [5, 6].

Again in connection with the sufficiency of the plaintiffs' evidence, the argument is made that they made no proof of any breach of warranty because their evidence did not establish a causal connection between the use of the weed killer and the loss. In candor, we consider this argument to be without substantial merit. There is no question that the 2, 4, 5–T was purchased from the defendant and that it was applied to the plots of ground upon which the plaintiffs were cultivating strawberries. Mr. John Schatz, a college teacher of horticulture and the operator of a commercial nursery, testified in response to a hypothetical question that the chemical herbicide caused the damage, and Mr. Winton Young, an experienced fruit grower who had examined at least some of the plaintiffs' damaged plants, said the damage "looked like herbicidal injury." Since it was directly shown that the 2, 4, 5–T was applied to the strawberry plants and that the plants suffered herbicidal injury, we consider the evidence sufficient to establish the use of 2, 4, 5–T as the cause of plaintiffs' loss. McLouth v. General Telephone Co. of the Southwest, D.C.Ark., 164 F.Supp. 496, 499 [1].

There are two additional arguments which can be appropriately considered here. The appellant maintains it should not be held liable because, even if it be assumed Archer gave a warranty, the plaintiffs failed to use the 2, 4, 5–T when the strawberry plants were dormant and failed to take notice of the warnings and directions to be followed in the pamphlet or advice bulletin and on the label found on the container when the herbicide was sold. We are going to consider these arguments in terms somewhat different from those used by the appellant, but that does not imply that we consider our terminology, so to speak, to be necessarily superior to the appellant's.

One of the principal points of controversy on this trial was whether the strawberry plants were dormant or nonvegetative at the time they were sprayed. The pamphlet or advice bulletin which Mr. Archer sent to Mr. Venie warns the user of chemicals similar to 2, 4, 5–T that "strawberry plants must be fully dormant" and "apply in late winter but before the strawberries begin growth." The significance of this warning clearly appears from a consideration of the way in which this weed killer operates. Essentially, 2, 4, 5–T is a hormonal herbicide which so greatly intensifies or stimulates plant growth that the plant is killed. As one witness put it, " * * * it actually speeds up respiration to the point of death." The weeds involved here are fall germinating plants, while strawberries are normally dormant or nonvegetative in cold weather. As Archer testified, "2,4,5–T is a plant hormone [and] must be circulated by a growing plant before it can become effective." Obviously if the 2, 4, 5–T were applied at a time when the weeds were growing but the strawberry plants were dormant, it should kill the weed and spare the plant.

Mr. Venie testified that he bought the 2, 4, 5–T on February 1, 1962, that he personally examined the plants before applying the spray, and that "they were dormant" when he sprayed them on February 2. Mr. Schatz, the horticulture instructor, said he

had never seen any active strawberry plants as early as the first week of February in the locality where plaintiffs' plants were being grown. Mrs. Metzger's testimony was similar to that given by Mr. Schatz.

The defendant introduced rather elaborate proof tending to show that the plants were probably not dormant on the day the 2, 4, 5–T was applied. This proof, for the most part, consisted of meteorological data and Mr. Archer's testimony that he had been "* * * fearful at that time that they would be coming out of dormancy, with the extreme warm weather we had had." Admittedly, the defendant's evidence, taken alone, tends to show that the weather was too warm to use the weed killer safely when it was applied.

Another point in controversy was whether the weed killer had been applied by the use of a proper spraying technique, but the most that can be said of the evidence on this point is that it appears the weed killer was applied by conventional methods, and Mr. Archer did testify that "* * * there was no stipulation made about method of application, probably would be presumed over-all spray when they were fully dormant." The defendant has also argued the effect of the label on the can, pressing upon our attention that 2, 4, 5–T is labeled primarily as a brush killer, and warns the user not to apply it directly to or otherwise permit it to come in contact with any crop plant or ornamental plant. The weakness of defendant's arguments concerning the label is that there is no direct and positive proof that the label on Mr. Venie's can of 2, 4, 5–T contained the same words as the can introduced in evidence by the defendant to show the contents of the label. Again, the evidence tends to show that the wording was the same, or very similar, but neither the manufacturer's representative nor Mr. Archer could say the words on Mr. Venie's label were the same as those found on the label which was introduced, and therefore it was a matter of fact whether the same warning was conveyed by both labels.

Rather abruptly and arbitrarily translating these arguments into legal terms, the warranty here was of the kind said to be inferred; the nature and extent of the warranty depends upon consideration of the representations or affirmations made by the seller and all the circumstances surrounding the transaction, Stone v. Farmington Aviation Corp., supra, 363 Mo. at 807, 253 S.W.2d at 812 [2, 3]; Turner v. Central Hardware Co., supra, 353 Mo. at 1189, 186 S.W.2d at 606 [4], 158 A.L.R. at 1407–1408, and it follows that the content of the bulletin and the instructions on the label cannot be ignored in ascertaining the terms of the warranty. One major aspect of the appellant's defense was that whatever representation had been made was dependent upon the plaintiffs' use of the weed killer according to directions, and of course liability on a warranty may be made dependent upon the occurrence or performance of conditions, in which case the warranty is usually described as a conditional warranty.[2] If liability on the warranty is conditional, then either compliance with or waiver of the conditions must be shown by the warrantee before he can recover for its breach. Dugan v. Trout, supra, 271 S.W. 2d at 597–598. Essentially, then, the defendant's arguments that the strawberry plants were not dormant, that the plaintiffs did not use a proper spraying technique, and that they did not follow the directions on the label, are but arguments that the conditions of the warranty have not been performed. Again, we can readily see the basis for these arguments, but the most that can be said is that, on all the points raised

**2.** W. L. Fleisher & Co. v. Cornwell, 328 Mo. 998, 1008, 43 S.W.2d 423, 427 [2, 3]; Nichols, Shepherd & Co. v. Larkin, 79 Mo. 264, 270–271; Dugan v. Trout, Mo.App., 271 S.W.2d 593, 597; Charles Lomori & Son v. Globe Laboratories, 35 Cal.App.2d 248, 95 P.2d 173, 177 [5]; London v. Curlee, Tex.Civ.App., 336 S.W. 2d 836, 837 [2] [3]; 2 Mechem, Sales, § 1232, p. 1068 (1901); 77 C.J.S. Sales § 337, p. 1224.

concerning compliance with these conditions, the evidence was in conflict, and the conflict was a matter for resolution by the trial court.

In so ruling, we have not overlooked the more involved arguments that the appellant has made, including its contention that Mr. Venie's conduct, in the circumstances, amounted to a species of contributory negligence or assumption of risk, nor have we ignored the citations of authority from other jurisdictions, principally Stull's Chemicals v. Davis, Tex.Civ.App., 263 S.W.2d 806, and Gibson v. California Spray-Chemical Corp., 29 Wash.2d 611, 188 P.2d 316, which the appellant has repeatedly called to our attention. We consider it unnecessary, however, to the disposition of this appeal, and probably most imprudent, to attempt any review of the law of warranties in sales of goods as it was when this case was tried, for the subject is now in large measure regulated by statute,[3] and our examination of the foreign cases merely strengthens our conviction that the law concerning the sale of food, drugs and chemical products is being developed along specialized lines. We will neither attempt to explain the past nor predict the future.

The appellant's last point concerns the award of damages. Specifically, the claim is made that the evidence does not support the award as to one plot, and that the trial court applied an incorrect measure of damages and awarded an excessive sum as to the other.

Though the evidence of damage is diffuse, the record indicates that during the 1962 season Mr. Venie was cultivating at least three plots, two of which belonged to the partnership. The first consisted of two acres in its third and last commercially bearing year. It was referred to as the "old" or "north" patch. It contained one and one-half acres of Belmar strawberries and one-half acre of Paymaster strawber-ries. Mr. Venie considered the Paymasters to be slightly inferior in quality to the Belmars; he described the Paymasters as "* * * not as productive a plant or as good a hedge maker as the other[s]." The plants on this old patch were about 90 per cent destroyed, though plaintiffs' evidence indicated they realized the sum of $277.00 from the sale of berries off the "old" patch. The second plot, called the "south" patch, was a new one-acre planting; it was completely destroyed. A third plot, owned by Venie individually, was not sprayed with weed killer but was located either next to or near the other plots, and the yield from Venie's own cultivation, along with other production figures, was used as a basis for calculating plaintiffs' loss of profits.

The trial court found that the plaintiffs could reasonably have expected to realize the sum of $1,950.00 after expenses on the two-acre plot. This was based on a reasonable expectation of a profit of $1,000.00 per acre from the better producing berries, and slightly less from the inferior berries. Because of the injury, the trial court found the plaintiffs actually realized only $277.00. Since the "old" patch was in its last bearing year, the trial court treated it as an annual crop and refused to allow the cost of reseeding. The court also found that the plaintiffs were deprived of profits on the "new" or "south" patch in the sum of $1,000.00, and that the reasonable cost of replanting it was $866.98. Treating the new patch as a perennial crop, the trial court allowed the cost of reseeding and made a total award of $3,539.98. Insisting that plaintiffs' damages must be assessed by the measure and method set out in Blackburn v. Carlson Seed Co., Mo.App., 321 S.W.2d 520, 522–523, the defendant points to various inconsistencies in plaintiffs' proof and asserts that there is no reasonable basis in the evidence for the assessment of the award.

---

3. L.1963, pp. 524–526, Sections 2–312 to 2–318, inclusive, now codified as Sections 400.2–312 to 400.2–318, R.S.Mo. (Supp. 1965) and V.A.M.S. See Lauer, Sales Warranties under the Uniform Commercial Code, 30 Mo.L.R. 259–287 (1965).

We find it wholly unnecessary to approach these assignments in terms of the adequacy of proof to establish the probable market value of plaintiffs' unmatured strawberry crop. Again we emphasize that with this type of review we are not particularly concerned with the method by which the trial court reached its conclusions, so long as it reached a correct result. Edgar v. Fitzpatrick, supra, 377 S.W.2d at 318 [12]; Bissell's Ex'rs v. Warde, 129 Mo. 439, 452–453, 31 S.W. 928, 932. As presented, plaintiffs' claim was primarily a claim for loss of profits during the 1962 growing season, although they also laid claim to the cost of reseeding on both patches, apparently on the theory that strawberries are perennial plants. On direct examination, Mr. Venie was asked if he had computed his per acre profit from the sale of strawberries in "non-frost" years. He had, for 1958 and 1959. In 1958 he realized "a little over thirteen hundred," and in 1959 "a little over a thousand." This was "after the payment of his expenses." One entry in the small notebook offered and received as Defendant's Exhibit "L" indicated that the net profit made from Mr. Venie's individual planting was $1,802.00. A plot set out to replace the "south" or "new" patch, which was completely destroyed, yielded a net profit of $1,266.27. There is another very informal entry in this same notebook which indicates an average net profit per acre per year of $975.00 for the years 1958 to 1961, inclusive. Mr. Venie testified, however, that 1960 and 1961 were not really comparable to 1962, because there had been frost during 1960 and 1961, while there had been none during 1958 or 1959. Possibly there is, as the appellant argues, some variance and inconsistency between the figures recited in the plaintiffs' various records, but the inconsistency, if any, was a matter for consideration by the trial court. It is well established that damages may be recovered for loss of profits caused by breach of warranty, if the evidence is certain enough to permit a rational estimate of the amount, Spruce Co. v. Mays, 333 Mo.

582, 593, 62 S.W.2d 824, 828 [5, 6]; Eastman Kodak Stores, Inc. v. Summers, Mo. App., 377 S.W.2d 476, 480–481 [8]; C. A. Wood Preserver Co. v. Springfield Gas and Electric Co., Mo.App., 243 S.W. 239, 240–241, and plaintiffs are not to be denied a substantial recovery if they have produced evidence from which the court can reasonably and fairly estimate their loss, even though the precise amount is somewhat uncertain. Faire v. Burke, 363 Mo. 562, 569, 252 S.W.2d 289, 294 [6]; Blackburn v. Carlson Seed Co., supra, 321 S.W.2d at 523 [5, 6]. Frankly, while we consider the figure of $1,000.00 per acre to be a most sanguine estimate, there is a record basis for it, and we cannot confidently say the trial court erred in adopting it.

On the other hand, we believe the cost of replanting the south or "new" patch was improperly allowed in this case. It is true enough that when the roots of a perennial crop are destroyed the cost of reseeding or replanting is ordinarily a proper element of the plaintiff's damage. Beaty v. N. W. Electric Power Cooperative, Mo. App., 312 S.W.2d 369, 372. Nevertheless, the usual measure of damages for destruction of a perennial crop, including the roots, is not applicable here for several reasons. In the first place, the distinction between an annual crop and a perennial crop is not at all as clear as the parties assume, although the question whether the cost of reseeding is to be allowed ordinarily depends upon a characterization of the crop destroyed as being one or the other. Ordinarily the term "annual crop" is equated with the more formal fructus industriales, that is, products of the earth which are the result of annual labor and cultivation (manurance) by the person in possession of the realty. Garth v. Caldwell, 72 Mo. 622, 627; 5 American Law of Property, Section 19.16, p. 64, note 1 (1952); 2 Tiffany, Real Property, Section 590, p. 525 (3rd ed. 1939). Some definitions make the point that a crop should be considered an "annual" crop if the produce in a given year is *principally* the result of attention

and care exerted in the same agricultural year. Restatement, Property, Section 121, comment f (1936). Others venture the opinion that the matter is a question of intention; crops are perennial if the planter intends them to become a part of the realty. 5 American Law of Property, Section 19.16, p. 64, note 1. Whether a crop in a given instance is to be considered an annual or perennial is subject to a profusion of views, but if the criteria set forth above were applied to this record a tenable argument could be made that strawberries are an annual crop. There is record evidence that the amount of cultivation and labor required for a second crop of strawberries is substantially the same as that required for the first. Mr. Schatz, plaintiffs' agricultural expert, called the cultivation for a second crop a "renewal" operation, and said there "would not be a lot of difference in the amount of labor and cultivation required from year to year." The figure $866.98 for labor and cultivation represented, he said, a yearly average. Certainly Mr. Venie did not intend to attach the plants to the realty; as a matter of fact, it appears he let the "south" patch lay fallow until fall, when he planted some cane. It does not appear, therefore, that strawberries are perennial in the same sense as the grass dealt with in Crouch v. Kansas City Southern Ry. Co., 141 Mo.App. 256, 124 S.W. 1077, aff'd Couch (Crouch) v. Kansas City Southern Ry. Co., 252 Mo. 34, 158 S.W. 347, 46 L.R.A.,N.S., 555, the alfalfa of which the court was speaking in Adam v. Chicago, B. & Q. R. Co., 139 Mo. App. 204, 122 S.W. 1136, or the bluegrass pasturage considered in Beaty v. N. W. Electric Power Cooperative, supra, 312 S. W.2d 369. See also Smock v. Smock, 37 Mo.App. 56, 65–66.

■ Assuming that strawberries are properly considered perennials, however, the fallacy of allowing the cost of replanting in this case lies in the fact that such allowance is made, usually, on the theory that destruction of the roots of the perennial has damaged the freehold,[4] while respondents, as informal partners or joint venturers, claimed the cost of replanting only because they "have lost more than one year's crop, at least so far as one patch is concerned." The plaintiffs concede they make no claim for damage to the inheritance, but claim the cost of reseeding because the plants would have borne in succeeding years. The substance of their argument, in our view, is that they have lost the prospect of a future crop and should therefore be compensated with a new planting. We cannot agree. The loss of future crops is not cognizable as an element of damages in a case of this kind, Beaty v. N. W. Electric Power Cooperative, supra, 312 S.W.2d at 372–373 [4], and in our view plaintiffs have no compensable damage because of their loss of roots which might produce them. We therefore conclude that the cost of reseeding the south patch was erroneously allowed.

The judgment should therefore be modified by reducing the award of damages to the sum of $2,673.00, and it is so ordered. Otherwise the judgment must be affirmed. The cause is remanded with directions to enter a new judgment for plaintiffs in the sum of $2,673.00 as of the date of the original judgment.

STONE, P. J., and RUARK, J., concur.

4. Cooley v. Kansas City, P. & G. R. Co., 149 Mo. 487, 494, 51 S.W. 101, 103–104 [6]; Adam v. Chicago, B. & Q. R. Co., supra, 139 Mo.App. at 207–208, 122 S.W. at 1136–1137 [2]; Mattis v. St. Louis & S. F. Ry. Co., 138 Mo.App. 61, 63, 119 S.W. 998; Carter v. Wabash R. Co., 128 Mo.App. 57, 62–63, 106 S.W. 611, 613; 3 Sedgwick, Damages, § 937 a, p. 1939 (1912).