CUDAHY, Circuit Judge.
 

 In this case, we consider whether com received under the federal government’s Payment-in-Kind (“PIK”) program — under which farmers receive surplus grain in exchange for an agreement not to plant their intended crop — constitute crop “proceeds” under the Uniform Commercial Code. The Bankruptcy Court for the Northern District of Illinois determined that PIK payments are proceeds and the District Court affirmed. We reverse.
 

 Leland and Mary Schmaling (the “Schmalings” or the “debtors”) are farmers in Jo Daviess and Carroll Counties, Illinois. On May 5, 1982, the Schmalings and the First National Bank of Freeport (the “Bank”) entered into a security agreement. The agreement covered the following collateral:
 

 All of the farm machinery and equipment, livestock and the young and products thereof, corn and all other crops grown or growing, and the feed, seed, fertilizer, and other supplies used in connection with the foregoing which are now owned or existing, and which are now located on the [Schmalings’] real estate ..., together with all property of a similar nature or kind to that therein described which may be hereafter acquired. ...
 

 In 1983, the Schmalings entered into a contract to participate in the United States Government’s PIK program. Under that program, a farmer agrees to remove a specified percentage of his farm’s acreage base and designated crops from production. He also agrees to follow certain soil conservation procedures. If the farmer takes these steps, the government transfers to him a commodity equal in quantity to a percentage of what his diverted or nonpro-ducing acreage would normally yield. 7 C.F.R. § 770
 
 et seq.
 
 (1984).
 

 The debtors assigned their PIK rights to three parties: Esther Schmaling, the Carroll Service Company and the State Bank of Pearl City. Esther Schmaling was assigned the right to receive 22,960 bushels of PIK corn. In reliance on this assignment, she loaned the debtors $47,537.92 in 1983. The State Bank of Pearl City loaned the debtors $12,000 in 1983 for operating and rent expenses and received the right to 6,612 bushels of PIK corn as collateral. Later, Pearl City loaned the debtors an additional $3,300, using the PIK corn as collateral. Carroll Service Company sold the debtors supplies for the 1982 farming season worth over $40,000. By September 1983, the debtors still owed $13,972.44 on their 1982 bill and assigned Carroll Service 6,200 bushels of PIK corn toward payment. Later, expenses from the 1983 season came due and the debtors owed Carroll Service $32,196.03.
 

 In October 1983, Esther Schmaling presented the document entitling her to the PIK corn to Johnston’s Feed Service for payment. Payment was denied on the basis of a claim by the Bank of Freeport stating that it was entitled to the PIK payment because of its security agreement with the Schmalings. Thereafter, upon agreement of the parties to the dispute, the total amount of the proceeds that the debtors were entitled to receive under the PIK program — $99,343.44—was deposited in a trust account with the debtors’ attorneys pending resolution of the respective priorities of the parties.
 

 On March 9, 1984, the Schmalings filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101
 
 et seq.
 
 On March 30, 1984, they filed a complaint in the Bankruptcy Court
 
 *682
 
 for the Northern District of Illinois under § 544(a) of the Bankruptcy Code
 
 [1]
 
 to set aside a lien against them in favor of the First National Bank of Freeport. Esther Schmaling, the Carroll Service Company and the State Bank of Pearl City intervened as parties plaintiff.
 

 The Bankruptcy Court found for the Bank. It concluded that, “although the agreement did not contemplate the not-as-yet-commenced Payment-in-Kind program and its proceeds specifically, its coverage was intended to be broad so as [sic] cover all of the debtor’s farm-related assets.”
 

 The United States district court affirmed. It found that because PIK payments are based on debtors’ prior growing history, participants in the program in essence “ ‘exchanged’ their own corn for the PIK corn,” thus making the PIK payments “proceeds.”
 
 [2]
 
 A contrary result, the court found, would create a potential for fraud, as farmers could avoid a security agreement in crops merely by abandoning their farming activities and participating in a Payment-in-Kind program. We disagree.
 

 I.
 

 Because the Bankruptcy court found the Schmalings’ intent to grant the Bank a security interest in all farm-related assets to be clear, it eschewed engaging in a “hypothetical bout over the meaning of the word ‘crops.’ ”
 
 Schmaling v. First National Bank of Freeport,
 
 Mem.Op. No. 84-A-2037 (Bankr.N.D.Ill. 8/1/84). However, a security interest granted by a debt- or to a creditor is limited strictly to the property or collateral described in the security agreement.
 
 See Allis Chalmers Corp. v. Staggs,
 
 453 N.E.2d 145, 148, 117 Ill.App.3d 428, 432, 72 Ill.Dec. 840, 843 (1983);
 
 In re Martin Grinding & Machine Works, Inc.,
 
 42 B.R. 888 (Bankr.N.D.Ill.1984); R. Anderson, 8 Treatise On The Uniform Commercial Code § 9-203:15 at 668 (a “security agreement is not effective beyond its terms”) (3d ed. 1980). Here, the security agreement does not refer to all farm-related assets. Rather, it grants the bank a security interest in certain specific assets pertaining to the debtors’ farm, including “corn and all other crops grown or growing.” Crops are “products of the earth which are the result of annual labor and cultivation ... by the person in possession of realty.”
 
 Venie v. South Central Enterprises,
 
 401 S.W.2d 495, 503 (Mo.App.1966);
 
 Finley v. McClure,
 
 567 P.2d 851, 222 Kan. 637 (1977).
 

 For something to be “proceeds” of crops, therefore, it must be received upon their “sale, exchange, collection or other disposition.” U.C.C. § 9-306(2);
 
 In re Connelly,
 
 41 B.R. 217, 220 (Bankr.D.
 
 *683
 
 Minn.1984) (“The term [proceeds] is meant to include anything that is received in consequence of the disposition of collateral.”); J. White & R. Summers, Treatise On The Uniform Commercial Code § 24-6, at 1011 (2d ed. 1980). But in the instant case there was never a crop of which to dispose. No corn was grown on the Schmalings’ real estate. One condition for participating in the PIK program was that individuals
 
 not
 
 plant a crop.
 

 As a consequence, most courts have concluded that inkind payments do not constitute proceeds of crops. As the court held in
 
 In re Mattick,
 
 45 B.R. 615, 617 (Bankr.D.Minn.1985), “Under the PIK programs involved in this case, the Debtors were paid for agreeing to forego planting any crop. They were not paid a subsidy. The right to the PIK entitlement was a general intangible, not proceeds of an existing, failed crop — or proceeds of anything.” Similarly, in
 
 Matter of Binning,
 
 45 B.R. 9 (Bankr.S.D.Ohio 1984), a ease similar to the one before us, debtors granted the bank a security interest in crops and afterwards enlisted in a payment-in-kind program. The security agreement made no reference to government entitlements as collateral. In finding that the bank had no right to the PIK payments, the court held, “Since the [bank’s] security agreement does not list government entitlements as collateral, either specifically or generally under the category of ‘accounts’ or ‘general intangibles,’ their after-acquired security interest cannot be found to extend to these entitlements.”
 
 See also In re Sunberg,
 
 35 B.R. 777, 781 (Bankr.S.D. Iowa 1983) (“the contractual right to a payment in kind is a ... general intangible within the intendment of that term under Iowa’s U.C.C.” However, bank has security interest in general intangibles and thus has right to PIK revenues.), aff
 
 'd
 
 729 F.2d 561 (8th Cir.1984);
 
 In re Schmidt,
 
 38 B.R. 380 (Bankr.D.N.D.1984) (“This court agrees with the decision in
 
 Sunberg
 
 which finds that the PIK diversion contract is an executory contract which is characterized as a general intangible under the U.C.C.”).
 

 Cases finding PIK and like payments to be proceeds of crops are generally distinguishable. In
 
 In re Kruse,
 
 35 B.R. 958 (D.Kan.1983) the court determined that PIK payments were proceeds where they substituted for crops that had been originally planted but were plowed under. However, the court found that PIK revenues were general intangibles and not proceeds where they were paid with respect to fields that had never been planted. In
 
 Matter of Munger,
 
 495 F.2d 511 (1974), the Ninth Circuit found federal subsidy payments to be proceeds of crops, but there the farmer had abandoned his sugar beet crop in order to take advantage of the subsidy. Similarly, in
 
 In re Nivens,
 
 22 B.R. 287 (Bankr.N.D.Tex.1982), Department of Agriculture disaster relief payments for cotton were found to be proceeds of crops. There, too, however, the subsidy was paid in compensation for already existing plants that had been cultivated through the recipient’s effort.
 

 Some cases have concluded that because the PIK payments substitute for crops that would have been grown but for the participation in the program, PIK receipts are proceeds.
 
 See In re Judkins,
 
 41 B.R. 369 (Bankr.D.Tenn.1984);
 
 In re Lee,
 
 35 B.R. 663 (Bankr.N.D.Ohio 1983). This argument has a certain appeal from an economic perspective since the government based its PIK calculations on the farmer’s past and anticipated yields and intended the program to reduce production of certain crops.
 
 See
 
 48 Fed.Reg. 9,233 (1983). This appeal is perhaps even greater where the farmer is paid in the commodity he would have planted. But the fact that the farmer ended up with bushels of corn to distribute cannot obscure the fact that PIK corn is not a'“crop” from that farmer’s land. Nor should the federal government’s intent in managing its agricultural programs or the broad economics of the transaction override the plain language of a security agreement which extends only to crops. The rationale of the transaction cannot cure clear deficiencies in the description of the collateral.
 

 
 *684
 
 We also cannot accept the district court’s contention that finding for the debtors will create an unintended potential for fraud. The court stated, “If PIK payments were not proceeds, a farmer could abandon all farming activities in favor of program participation, thereby allowing him to dissipate the proceeds of the programs without any regard for his creditors’ interests.” This argument can be made anytime a farmer finds a substitute use of his land, such as using his fields for a rock concert or a fair ground instead of for the growing of crops. Clearly, income derived from such alternative uses could not be considered crop proceeds. Moreover, banks can easily avoid such potential losses of collateral by careful drafting,
 
 see In re J. Catton Farms, Inc.,
 
 779 F.2d 1242, 1245 (7th Cir.1985), and we see no good reason to apply unjustifiably loose constructions to documents of this kind. Even if this particular PIK program was new, land diversion programs and federal subsidies of this sort to farmers have been commonplace for years.
 
 Cf. Matter of Binning,
 
 45 B.R. 9, 12-13 (Bankr.S.D. Ohio 1984) (“Land diversion programs have been in existence in one form or another since at least 1949. As a federally chartered instrumentality, operating under the auspices of the farm credit administration ... the [bank] could hardly claim to be ignorant as to be the existence or nature of these programs; nor could it claim to be unversed in drafting security agreements which adequately describe government entitlements as collateral.”) The bank could presumably have acquired an interest in PIK revenues either by referring to government entitlements directly or by including a reference to general intangibles or to contract rights.
 
 See In re Sunberg,
 
 35 B.R. 777. Since the Bank did none of these things, the district court was incorrect in granting it the right to the Schmal-ing’s PIK payments.
 
 [3]
 

 The decision below is therefore Reversed.
 

 [1]
 

 . Section 544(a) — the "strong arm clause” of the Bankruptcy Code — states:
 

 (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the dealer or any obligation incurred by the debtor that is voidable by—
 

 (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists....
 

 Under section 544(a), the trustee takes the position of a hypothetical lien creditor and can avoid any unperfected security interest. In their complaint against the Bank of Freeport, the Schmalings stated that even if PIK revenues were proceeds, the Bank’s interest in them was unperfected, as proceeds paid in tangible property require the filing of a financing statement for perfection under § 9-306(3) of the U.C.C. As the Bank never filed a financing statement specifically mentioning the in-kind payments, the Schmalings contended, the Bank’s interest was subordinate to the interest of the Schmal-ings’ assignees.
 

 [2]
 

 . Under the U.C.C., a security interest will continue in proceeds of collateral described in the security agreement unless the agreement or the secured party specifies otherwise. § 9-306(2) states:
 

 Except where this Act otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds, including collections received by the debtor.
 

 [3]
 

 . As we find that payments-in-kind do not constitute crop proceeds for purposes of construing the security agreement, it is unnecessary to determine whether proceeds paid in grain require additional measures for perfection under U.C.C. § 9-306(3).