In re Truman R. KINGSLEY and Connie Kingsley, Debtors.

Truman R. KINGSLEY and Connie Kingsley, Appellants,

v.

FIRST AMERICAN BANK OF CASSELTON, Appellee.

No. 87–5396.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1988.

Decided Jan. 26, 1989.

Joseph A. Vogel, Jr., Mandan, N.D., for appellants.

Hart Kuller, St. Paul, Minn., for appellee.

Before LAY, Chief Judge, PECK,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

* The HONORABLE JOHN W. PECK, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

JOHN R. GIBSON, Circuit Judge.

The central issue in this case is whether farm deficiency and diversion payments under the federal price support and production adjustment programs are "proceeds" of crops under North Dakota law and therefore covered by a security agreement applying to crops and their proceeds. Truman and Connie Kingsley appeal from an order of the district court reversing the bankruptcy court and upholding as enforceable First American Bank of Casselton's claimed security interest in the Kingsleys' 1986 crops, cash proceeds thereof, and federal deficiency and diversion payments. We are convinced that these payments, arising from contracts between the Kingsleys and the federal Commodity Credit Corporation, are not proceeds of the 1986 crops and therefore are not covered by First American's security agreement. Accordingly, we reverse the judgment of the district court and remand the case to the bankruptcy court for further proceedings.

This case was submitted to the bankruptcy court and appealed to the district court on stipulated facts and documents, and we state the facts on the basis of the stipulated material in the record before the district court.

The Kingsleys farm in Cass County, North Dakota. In 1986, they owned two tracts of land and rented eight others, and their farming activities included raising cattle, wheat, soybeans, corn, and barley. On April 10, 1986, the Kingsleys entered into contracts with the U.S. Department of Agriculture's Commodity Credit Corporation (CCC) to participate in the 1986 price support and production adjustment programs for their wheat, corn, and barley crops. Record at 54–76. With respect to production adjustment, the Kingsleys agreed to devote specified percentages of their cropland to "approved conservation uses" rather than planting, *id.* at 55, and in return they would receive "diversion payments" in the form of commodity certificates from the CCC. *Id.* at 57. With regard to price support, the CCC would make "deficiency payments" to the Kingsleys. These payments would be calculated using a complex formula; one element, the deficiency payment rate being based on the amount by which the Department of Agriculture's target price for each crop exceeded the Department's national market price or loan rate, whichever was higher. *Id.* at 56.

On April 15, 1986, the Kingsleys and First American entered into an agreement including provisions for a $200,000 loan. Record at 86. On April 23, the Kingsleys gave First American a promissory note for the loan, *id.* at 82, secured in part by a separate agreement granting the bank a security interest in "[a]ll crops of every type and description grown and/or harvested" by the Kingsleys on the various tracts of land in 1986 and "[a]ll proceeds and products of all the foregoing." *Id.* at 46.[1] The Kingsleys also assigned $20,000 of their 1986 deficiency and diversion payments to the bank. *Id.* at 48.

The Kingsleys fell behind in payments on the loan, and on October 31, 1986, they filed for reorganization under Chapter 11 of the bankruptcy code, 11 U.S.C. §§ 1101–1146 (1982 & Supp. IV 1986). On November 26, the Kingsleys filed an adversary proceeding in the bankruptcy court to determine the validity of First American's security interest in their 1986 crops and

---

1. On April 28, First American perfected its interest in the Kingsley's crops and proceeds by filing a financing statement with the Cass County Register of Deeds and a Central Notice Form with the North Dakota Secretary of State. Record at 50–53. The financing statement, however, does not show that products of the crops are covered by a security agreement. *Id.* at 51. The financing statement is a standard U.C.C. preprinted form which provides boxes for the secured party to check if proceeds or products of the collateral are covered by the statement. While First American checked the "Proceeds" boxes on the statement, it did not check the nearby "Products" boxes. Record at 51. Moreover, the bank did not file a financing statement covering the assignment with the county or the state, although it did file the assignment form with the local office of the federal Agricultural Stabilization and Conservation Service. *Id.* at 43. The only significance of the failure to perfect the security interest in "Products" is to affect at least in part the basis for the bankruptcy court's decision, which we fully address in part I, *infra*.

farm program payments. The Kingsleys alleged that First American did not have a perfected security interest in the government payments because they failed to perfect by proper filing of a requisite financing statement and therefore its lien was subject to avoidance powers of the debtor in possession under the Bankruptcy Code. Amended Complaint, ¶¶ 8–10.

In an order entered on April 29, 1987, the bankruptcy court ruled that the government payments were not "proceeds" of the 1986 crop, but were "products" thereof, and were therefore covered by the "products" language in First American's security agreement. *See In re Kingsley*, 73 B.R. 767, 770–71 (Bankr.D.N.D.1987). The bankruptcy court then looked to a North Dakota statute declaring invalid a security agreement covering specific crops if it claimed a security interest in other personal property. *See* N.D.Cent.Code § 35–05–04 (1980). Since the security agreement covering both the crops and proceeds also covered the government payments, which as "products" would qualify as "personal property" under the statute, it ruled that First American's security agreement was invalid as to the 1986 crops and proceeds, but valid with respect to the government payments. *See Kingsley*, at 771–72.

First American appealed to the district court, which reversed, ruling that the government payments were simply "another form of proceeds" from the 1986 crops, rather than "other personal property," and therefore First American's security agreement was valid in full, covering the crops, their cash proceeds, and the government payments. *In re Kingsley*, 92 B.R. 898, 899, 900 (D.N.D.1987).

On appeal, the Kingsleys argue that the district court erred in ruling that the government payments are "proceeds" of the 1986 crop; that the payments consequently are not covered by First American's security agreement; and, alternatively, if the payments are covered, then the agreement is invalid because it covers both

specific crops and other personal property. First American argues that the Kingsleys are barred from raising the first two issues by their failure to cross-appeal from the bankruptcy court's ruling; that, in any event, First American's security agreement covers the government payments; and that the agreement is valid under North Dakota law.

### I.

■ We initially reject First American's argument that we are barred from considering the bankruptcy court's ruling that the bank holds a valid security interest in the government payments. The bankruptcy court concluded that the payments were "products" of the 1986 crops. *Kingsley*, 73 B.R. at 769, 770–71. The district court, while stating that this determination was not appealed, *Kingsley*, 92 B.R. at 899, examined and rejected the reasoning of the bankruptcy court on this issue, *id.* at 899–900, and ruled that First American's security interest was valid on the different theory that the payments were "proceeds" of the crops. *Id.* at 900. First American has acknowledged this change in approach and the error in the bankruptcy court's analysis. Under North Dakota law, crop products include such things as ginned cotton or maple syrup held by the farmer in an unmanufactured state. *See* N.D.Cent.Code § 41–09–09(3) (1983) (U.C.C. § 9–109(3)). In addition, the bank's financing statement did not include reference to crop products, *see* Record at 51, and therefore First American did not perfect its interest in the products.[2]

Thus, the basis for the bankruptcy court's ruling regarding First American's interest in the government payments based on its determination that they were products was considered and properly rejected by the district court. No one has contested this aspect of the district court's ruling on appeal, and it is unnecessary for us to further consider the matter. The Kingsleys now challenge the district court's ruling that government farm program pay-

---

**2.** The bank's unperfected interest could therefore be avoided under the "strong-arm" clause of the bankruptcy code, 11 U.S.C. § 544(a) (Supp. IV 1986).

ments are "proceeds" of crops, and there is no question that this issue, squarely addressed in the court below, is properly before us. *See generally Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

## II.

Under North Dakota law, proceeds include "whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds." N.D.Cent.Code § 41–09–27(1) (1983) (U.C.C. § 9–306(1)). The Supreme Court of North Dakota has not decided whether federal deficiency and diversion payments are crop proceeds. However, the relevant provisions of North Dakota law are enactments of the Uniform Commercial Code. While we may therefore consider U.C.C. decisions from other jurisdictions material to our analysis, as the bankruptcy and district courts did, we are confronted with a division of authority based substantially on differences among the various types of government farm payment programs. We therefore look to the specific features of the two programs involved here to determine whether diversion and deficiency payments, respectively, are proceeds of crops under section 41–09–27(1). The Kingsleys signed a "contract to participate in the 1986 price support and production and adjustment programs," the terms and conditions of which were contained in a ten page appendix to the contract also requiring their signature. Accordingly, resolution of the issues before us require that we analyze these documents, as well as the statutory and regulatory framework on which they are based.

## A.

■ The Secretary of Agriculture is authorized to make land diversion payments to producers of wheat and feed grains, including corn and barley, who "devote to approved conservation uses an acreage of cropland on the farm in accordance with land diversion contracts entered into by the Secretary with such producers." 7 U.S.C. §§ 1444e(f)(5)(A) (feed grains), 1445b–3(f)(5)(A)(i) (wheat) (Supp. IV 1986). The Secretary may regulate the amounts payable to producers under these contracts through bids or "such other means as the Secretary determines appropriate." 7 U.S.C. §§ 1444e(f)(5)(B), 1445b–3(f)(5)(A)(ii). *See* 7 C.F.R. §§ 713.53, 713.58 (1988).

Here the Kingsleys entered into a series of land diversion contracts with the Secretary through the CCC[3] for their 1986 wheat, corn, and barley crops. The appendix to these contracts requires the Kingsleys to devote 2.5% of their land for each crop to conservation uses. Record at 57. The appendix also provides a formula for determining the amount of the diversion payments, which is essentially based on the past yield of the diverted acres and calculated at a rate which is roughly 25% of the government's 1986 target price for each crop. *See id.* at 57 (App. paragraph 5B); *see also id.* at 54; 7 C.F.R. 713.6(a)(1) (1988). Further details of these arrangements are not necessary to the issues before us. Their basic effect is to compensate the Kingsleys for converting cropland to conservation uses as part of a general program for regulating the total national acreage of the crops they produce. *See* 7 C.F.R. § 713.49(d) (1988); *see also* 7 U.S.C. §§ 1444e(f)(5)(A), 1445b–3(f)(5)(A)(i).

This diversion program is analogous to the payment-in-kind (PIK) program we examined in *In re Sunberg,* 729 F.2d 561, 561–62 (8th Cir.1984), in which farmers who converted land to non-crop use received surplus commodities from the United States.[4] We were not required in *Sunberg,* however, to decide whether such rights are crop proceeds, *see id.,* nor have we done so since. *See In re Branderhorst,*

---

3. *See* 7 U.S.C. §§ 1444e(j), 1445b–3(j).

4. Here the Kingsleys were paid in commodity certificates, which may be transferred or exchanged for cash or commodities in the CCC inventory. 7 C.F.R. § 770.4 (1988). The specific form of payment is not material to our analy-

sis. Under section 41–09–27(1), our focus is on the relationship between the Kingsleys' disposition of their crops and their right to diversion payments, and in this respect the PIK program is precisely analogous to the diversion program involved here.

843 F.2d 311, 313 (8th Cir.1988) (per curiam). First American, like the courts below, relies primarily on *Osteroos v. Norwest Bank Minot*, 604 F.Supp. 848, 849 (D.N.D.1984), in which the district court, applying North Dakota law, ruled that a security agreement and financing statement covering crops, proceeds and products thereof were sufficient to create a perfected security interest in PIK payments. The *Osteroos* court based its decision on the grounds that the PIK payments were received as a substitute for the crops the farmers would otherwise have planted, and that they were analogous to federal deficiency and disaster payments. *Id.*

In the recent case of *In re Schmaling*, 783 F.2d 680, 683 (7th Cir.1986), the Seventh Circuit thoroughly reviewed the decisional authority governing in-kind diversion payments and concluded that such payments are not crop proceeds. It observed that unlike a subsidy, diversion payments result from a farmer's agreement not to plant certain crops. *Id.* The court also distinguished diversion payments from abandonment and disaster relief payments, which result when a planted crop is plowed under or fails. *Id.* The court reasoned that in the latter instances, the government payments might be considered "substitutes" for the original crops (although it did not decide the issue), but that this rationale did not extend to crops which were never planted. *Id.*

It is not necessary to repeat here the careful analysis of precedents undertaken by the *Schmaling* court. Suffice it to say that we are persuaded by the court's reasoning and convinced that it should be applied to this case. The Kingsleys entered the federal diversion program on April 10, 1986, five days before First American agreed to extend them a loan and nearly two weeks before the Kingsleys granted the bank a security interest in their crops.

First American was aware of the limited planting the Kingsleys would undertake in 1986, and sought assignment of the 1986 diversion payments. The bank failed, however, to perfect this assignment, or to seek a security agreement specifically covering the payments, although it could readily have done so. *Cf. Schmaling*, 783 F.2d at 683; *Sunberg*, 729 F.2d at 561–62. In these circumstances, it would be particularly inappropriate to rule that the diversion payments are proceeds or "substitutes" for the 1986 crops. *Cf. Schmaling*, 783 F.2d at 683 (farmer entered PIK program *after* granting bank a security interest in crops). There is simply no sense in which the Kingsleys received the diversion payments "upon the sale, exchange, collection or other disposition" of their crops, as section 41–09–27(1) requires. Accordingly, we conclude that the district court erred in interpreting the definition of "proceeds" in section 41–09–27(1) as including the Kingsleys' diversion payments. *Osteroos* was not appealed to this court, and is not persuasive to us. We decline to apply its analysis of PIK payments to the Kingsleys' diversion payments.

### B.

■ Whether the Kingsleys' deficiency payments are proceeds of their 1986 crops is a more difficult question. These payments are part of the federal price support program. Under this program, producers of wheat and feed grains, including corn and barley, are compensated under a formula using a deficiency payment rate. This rate is the amount by which the target price for the crop exceeds the higher of the national weighted average market price received by farmers for the crop during the first five months of the marketing year, or the national average loan rate for the crop before reduction to maintain the crops competitive market position.[5] *See* 7 U.S.C.

---

5. The formula for deficiency payments is contained in paragraph 4A of the appendix and the deficiency payment rate is defined in paragraph 4C of the appendix. The terms in the deficiency payment calculation, "acreage for payments" and "farm yield," are defined in paragraphs 1B and 1M in the general definitions section of the appendix, having application to both deficiency and diversion programs. Reference is made in defining acreage of the crop planted for harvest to conserving usage credited to the crop (App. Paragraph 1B). Permitted acreage is the maximum that may be planted for harvest (App. paragraph 1M).

§§ 1444e(c)(1)(C) (corn), 1444e(c)(1)(F) (barley), 1445b-3(c)(1)(D) (wheat); 7 C.F.R. § 713.108 (1988) (wheat and feed grains). The Secretary sets the target price after considering a variety of factors related to the crop's supply and demand.[6] Under certain limited circumstances the deficiency payments can take into consideration a percentage of the preceding year farm program payment yield. *See* 7 C.F.R. § 713.108(c)(1), (2) (looking to 1985 crop yields). Finally, the combined total of deficiency and diversion payments under these provisions in 1986 cannot exceed $50,000. 7 U.S.C. § 1308(1) (Supp. III 1985), *amended by* 7 U.S.C. § 1308(1) (Supp. IV 1986).[7]

This complex price support system was incorporated into the Kingsleys' contract with the CCC, including the Secretary's specific target prices for each crop. Record at 56–57. Again, we need not delve into this system in any further detail. Like the land diversion program, the price support program is part of a larger, general system for regulating national production of basic agricultural commodities. *See* 7 U.S.C. §§ 1444e(a), (b); 1445b-3(a), (b).

We believe that deficiency payments, like the diversion payments, are not proceeds within the meaning of the statute, as they were not received by the Kingsleys upon the sale, exchange or other disposition of their 1986 crops, but resulted solely from the Kingsleys' contracts with the CCC. *See* N.D.Cent.Code § 41–09–27(1). First American argues that the term "proceeds" should be interpreted broadly and that deficiency payments should be treated as proceeds or "substitutes" for proceeds, because they are part of the minimum return the Kingsleys expected on their crops.

*See, e.g., In re Munger,* 495 F.2d 511, 513 (9th Cir.1974); *In re Nivens,* 22 B.R. 287, 291–92 (Bankr.N.D.Tex.1982). While this approach has significant appeal, it does not withstand close analysis and we are convinced that it should not be applied here. A study of the documents upon which the payments are made convincingly demonstrates that the payments are based on contract rights having origin in the statutory and regulatory fabric of the farm support program, rather than upon marketing the crop.

The deficiency and diversion programs are closely interrelated, and both are described in detail in the same ten-page appendix attached to the contract which the farmer must sign. The deficiency payments are keyed to the permitted acreage (App. paragraph 4B(a)), defined as part of the agreement to devote land to conservation usages (App. paragraph 1M & 2D), which is in turn the essence of the diversion program. The two types of payment are subject to a common overall limit, and the CCC contracts and appendix indicate that farmers agreeing to participate in one program must also participate in the other. *See* Record at 55, 56–58, 69, 71, 73. The appendix specifies particular dates on which the deficiency payments are to be made without any reference to when the crop is marketed. As the deficiency and diversion programs are part and parcel of the same program, it is nearly impossible to make a useful distinction between the payments. Following *Schmaling,* 783 F.2d at 683, we could perhaps emphasize that deficiency payments subsidize the farmer's return on planted crops, while diversion payments compensate the farmer for not planting. We are not dealing with a simple

---

**6.** These factors include:

(1) the supply of the commodity in relation to the demand therefor, (2) the price levels at which other commodities are being supported and, in the case of feed grains, the feed values of such grains in relation to corn, (3) the availability of funds, (4) the perishability of the commodity, (5) the importance of the commodity to agriculture and the national economy, (6) the ability to dispose of stocks acquired through a price-support operation, (7) the need for offsetting temporary losses of export markets, [and] (8) the ability and will-

ingness of producers to keep supplies in line with demand * * *.

7 U.S.C. § 1421(b) (Supp. IV 1986).

**7.** Because the Secretary also reduced the national level of loans and purchases for wheat, corn, and barley in 1986, *see* Record at 57, additional deficiency payments were required to provide producers with the same return they would have received without such an adjustment. 7 U.S.C. §§ 1444e(c)(1)(D)(i), 1445b-3(c)(1)(E)(i); 7 C.F.R. § 713.108(a)(4). These additional payments do not affect our analysis, however.

crop subsidy, however, and consistent application of this approach would require a further distinction between those deficiency payments based on planted acreage and those based on diverted land. In either case, we would necessarily increase the complications in this area and thereby frustrate one of the overriding aims of North Dakota's commercial code—to simplify and clarify the law governing commercial transactions. *See* N.D.Cent.Code § 41–01–02(2)(a) (1983) (U.C.C. § 1–102(2)(a)). Such a result is, of course, to be avoided. *See* N.D.Cent.Code § 41–01–02(1). A study of the contract documents upon which the diversion and deficiency payments are based convinces us that the diversion payments are not proceeds, and while the deficiency payments may fall closer to the definition, the difficulty of distinguishing deficiency and diversion payments satisfies us that we should not expand the definition of proceeds in section 41–09–27(1) to include the deficiency payments.

In these circumstances, we simply cannot dismiss the fact that the deficiency payments do not fall within the definition of proceeds. The wide variety and changing forms of federal farm payment programs have continued to generate difficulties for farmers, farm lenders and courts in determining the extent of security interests in crops and their proceeds, as this case amply demonstrates. In contrast, there appears to be no dispute with our ruling in *Sunberg*, 729 F.2d at 562–63, that rights to government farm payments are either accounts or general intangibles under the U.C.C., and that security interests in these rights may be created through a security agreement applying specifically to such collateral.

Accordingly, we conclude that the definition of proceeds set forth in N.D.Cent.Code § 41–09–27(1) should not be expanded to include the Kingsleys' federal deficiency payments under the 1986 price support program.

### III.

In closing, we acknowledge that we accord substantial deference to the district court's resolution of unsettled state law questions. *See Kansas State Bank v. Citizens Bank*, 737 F.2d 1490, 1496 (8th Cir. 1984). "We are not, however, bound by that interpretation and 'must reverse if we find that [it] has not correctly applied local law.'" *Id.*, quoting *Bazzano v. Rockwell Int'l*, 579 F.2d 465, 469 (8th Cir.1978). We are satisfied that this is such a case, and that under a proper interpretation of North Dakota law, the Kingsleys' federal diversion and deficiency payments are not proceeds of their 1986 crops.

The complex issues before us arise primarily because the highly specific definitions governing federal farm payment programs are drawn with entirely different considerations in mind than those that prompted the drafting of the U.C.C. In essence, we are presented with the challenge of attempting to locate some rational relationship between the differing definitional structures. We understand that banks and other creditors prefer to use preprinted forms based on the language of the U.C.C. because this simplifies their operations. We must compare the language in those forms with the language of the changing government farm programs, as we have here attempted to do. We are satisfied that when the farmer sits at the table with his banker to obtain a loan, both know about the farm support programs and the particular terminology current at that time. If the banker desires a security interest in such programs, it is a simple matter for those definitional terms to be used. All parties would then clearly understand what is intended. When it is necessary that we attempt to compare the statutory language of the U.C.C. with the changing nature of the farm programs and the language utilized there, the difficult problems we have faced in this case present themselves and it is evident that the results are less predictable. This, of course, is only to suggest that carefully tailored documents have benefits over very general ones, but here the benefits in the long run to all concerned might be considerable.

The judgment of the district court is reversed. The case is remanded to the bankruptcy court for further proceedings.