**In re Gary STEVENS and Jenise Stevens.**

No. 3:03–BK–11633 E.

United States Bankruptcy Court,
E.D. Arkansas,
Jonesboro Division.

March 3, 2004.

Jeannette A. Robertson, Jonesboro, AR, for Debtors.

Robert J. Gibson, Jonesboro, AR, for Union Planters.

## ORDER GRANTING APPLICATION AND AMENDED APPLICATION TO INCUR DEBT

AUDREY R. EVANS, Chief Judge.

On July 29, 2003, Debtors' Application to Incur Debt and Amended Application to Incur Debt ("**Applications**") were scheduled for hearing, along with objections to said Applications by certain parties, including Union Planters Bank, N.A. ("**Union Planters**"). Union Planters objected to Debtors' obtaining a 2003 crop operating loan, to the extent that Debtors would be pledging government payments as collateral, since Union Planters claimed a security interest in all 2003 government payments related to Debtors' farming operation ("**2003 government payments**"). On December 18, 2003, the Court entered an agreed Order granting in part Debtors' Applications. In this Order, the parties agreed to permit Debtors to incur debt to be secured by the crops currently growing on Debtors' land. The parties also agreed to continue, pending submission of briefs and stipulated facts, that portion of the Applications and objections thereto addressing whether Debtors could use their 2003 government payments as collateral for the 2003 crop operating loan. Union Planters and Debtors have submitted briefs and stipulations. Accordingly, the issue now before the Court is whether Union Planters has a security interest in the 2003 government payments to Debtors and whether that interest, if any, was perfected prior to the filing of the instant bankruptcy petition. The Court concludes that Union Planters' did have a security interest in the 2003 government payments which attached in October 2002, but that such interest was not properly perfected prior to the filing of the instant bankruptcy petition.

### FACTS

Debtors and Union Planters stipulated to the following facts:[1]

1. On May 2, 2002, Debtors executed a Promissory Note (# 720013554161) in the total principal amount of $583,000.00 with an interest rate of 7.5% per annum, payable on demand, or if no demand is made then all outstanding principal and unpaid interest was due on April 1, 2003 ("**the Note**").

2. The Note is secured by an Agricultural Security Agreement ("**Security Agreement**") executed by Debtors on May 2, 2002. The Security Agreement granted to Union Planters Bank a security interest in "government payments" and "all farm equipment." "The collateral includes any and all of Grantor's present and future rights, title and interest in and to all crops growing or to be planted, cultivated, grown, raised and/or harvested on the land more fully described herein or on any exhibit attached hereto and expressly made a part hereof ...." The land described in that Security Agreement is: "Landowner—Don Throesch—FSA # 5094; Land-

---

1. The parties submitted all documents referenced in this section to the Court for its consideration.

owner—Gary Stevens—FSA # 2945; Landowner—J.C. Mahon—FSA # 15; Landowner—Gary Stevens—FSA # 5838; Landowner—T & L Johnson—FSA # 2507." [2] No other land is described or attached to the Security Agreement. Those farms being in Craighead County or Jackson County.

3. The current land being farmed by the debtors for 2003–2004 are FSA numbers 5361 and 3758 in Craighead County and FSA numbers 2945, 1123, and 15 in Jackson County.

4. In connection with the Note and Security Agreement, Union Planters caused to be filed a UCC Financing Statement in Craighead County on May 15, 2002 covering: "All crops and government payments; whether any of the foregoing is owned now or acquired later; whether any of the foregoing is now existing or hereafter raised or grown; all accessions, additions, replacements and substitutions relating to any of the foregoing (including all entitlements, rights to payment, and payments, in whatever form received, including but not limited to, payments under any governmental agricultural diversion programs, governmental agricultural assistance programs, the Farm Services Agency, Wheat Feed Grain Program, and any other such program of the United States Department of Agricultural, or any other general intangibles or programs); all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing, including insurance, and general intangible and accounts proceeds." Union Planters Bank also caused the UCC Financing Statement related to government payments to be filed in Jackson County on May 16, 2002. No additional or modified UCC Financing Statements were filed af-

ter the two noted herein by Union Planters with regard to Debtors.

5. The parties agree that Union Planters also filed a UCC Financing Statement on equipment, in Craighead County and Jackson County, along with a Mortgage on real property at 4542 Highway 18, Cash, Arkansas 72421.

6. The Farm Security and Rural Investment Act of 2002, P.L. No. 107–171, 116 Stat. 134 ("**2002 Farm Bill**") was enacted on May 13, 2002. The sign-up period for direct and counter-cyclical payments for the fiscal years 2002 and 2003 was October 1, 2002 to June 2, 2003.

7. The claim of Union Planters in Debtors' bankruptcy related to the Note is in the total sum of $256,717.95. The amount of that claim that is secured versus unsecured with regard to the value of the collateral is still an open question.

8. The only document that currently specifies an interest in the 2003 crop government money signed by the debtors is the FSA assignment document. This document was signed September 15, 2002 by the debtors and October 11, 2002 by a representative of Union Planters Bank.

9. The parties stipulate that no new or modified promissory notes, security agreements or UCC financing statements were signed after May 2002. The parties also stipulate that no new money was given by Union Planters Bank to the debtors upon the signing of the September 15, 2002 FSA assignment document.

10. The parties agree that Union Planters loaned no money to nor did the debtors use any money from Union Planters to plant or harvest the 2003 crops. Debtors were authorized by this Court to

---

**2.** "FSA" stands for the Farm Service Agency, a division of the U.S. Department of Agricul- ture.

use a separate crop lender for the 2003 crops.

11. Debtors filed for bankruptcy on the 10th day of February 2003.

12. Debtors did not begin their farming operation in 2003 until March 2003.

## DISCUSSION

### I. Introduction

The status of Union Planters' security interest in Debtors' 2003 government payments rests on the interaction between Arkansas state law, the 2002 Farm Bill and related federal regulations, and the Bankruptcy Code. Although the interaction of these statutes is complex, the analysis is structured by the basic principles of secured transactions. Since the framework of this case rests in large part on the Arkansas law of security interests, a summary of that basic law is provided below.

■ State law controls the creation and perfection of security interests. *See Meeks v. Mercedes Benz Credit Corp. (In re Stinnett)*, 257 F.3d 843, 845 (8th Cir. 2001) (citing *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (state law applies to determine security interests)). Under Arkansas law, absent an agreement expressly postponing the time of attachment, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral. ..." Ark.Code Ann. § 4–9–203(a).[3]

■ The following requirements must be met for a non-possessory security interest to become enforceable against a debtor:(1) value is given by the secured party to the debtor; (2) the debtor has rights in the collateral; and (3) the debtor has au-

thenticated a security agreement in favor of the secured party that provides a description of the collateral. *See* Ark.Code. Ann. § 4–9–203(b); *see also In re Tracy's Flowers and Gifts, Inc.*, 264 B.R. 1, 3 (Bankr.E.D.Ark.2001) (citations omitted). "[A] security interest may be created in after-acquired property of a debtor. A security agreement that provides for a security interest in after-acquired property is valid and will create a security interest when the debtor acquires rights in the collateral and all of the other requirements for creating a security interest have been met." *In re Toombs*, 2002 WL 32115829, at *3 (Bankr.E.D.Ark. Sept.25, 2002) (citation omitted); *see also* Ark.Code Ann. 4–9–204(a) (after-acquired property).

■ To perfect a security interest, subject to exceptions not relevant here, a financing statement must be properly filed. *See* Ark.Code. Ann. § 4–9–310(a). The filing of a financing statement is also required for perfection of collateral which is after-acquired property. *See Toombs*, at *3 (citations omitted) ("A security interest in after-acquired property is perfected when it has attached and the applicable steps for perfection have been performed.")

### II. Attachment of Union Planters' Security Interest

■ The stipulated facts indicate that Union Planters gave value to Debtors, and Debtors authenticated the Security Agreement. Because Union Planter's security interest relies on an after-acquired property clause, when Union Planters' security interest attached depends on exactly when Debtors acquired rights in the 2003 government payments, the collateral at issue.[4]

---

**3.** All Arkansas code sections cited in this Order refer to the code as amended in 2001.

**4.** Debtors also make a number of arguments regarding their intent in signing the Security Agreement, as well as the scope of the Secu-

Debtors argue essentially that their right to the 2003 government payments accrued upon the planting of crops in March of 2003, after the filing of the instant petition and therefore, Union Planters' security interest could not attach to these payments. Although seemingly logical on its face, this argument is ultimately incorrect, since, given the nature of the government payments at issue, Debtors did have the right to the 2003 government payments prior to the filing of this case and independent of their 2003 crops.

In order to understand why this is so and to determine when Debtors' rights to the 2003 government payments accrued, a review of the complex web created by the 2002 Farm Bill and related regulations is required.[5] That portion of the 2002 Farm Bill relating to commodity programs is codified at 7 U.S.C. § 7901, *et. seq. In re Wilson,* 296 B.R. 810, 811 (Bankr. N.D.Iowa 2003). Debtors' 2003 government payments at issue here are "direct and counter-cyclical payments," as indicated on the FSA assignment form submitted

to the Court.[6] These payments are part of the "direct and counter-cyclical program" ("**DCP**"). *See* 7 U.S.C. §§ 7911–7918. Regulations related to the DCP can be found at 7 C.F.R. Part 1412, and the definitional sections are contained at 7 C.F.R. § 1412.103. Definitions which govern the DCP can also be found at 7 C.F.R. Parts 1400 and 718. Under the direct payment portion of the DCP, "[t]he Secretary of Agriculture 'shall make direct payments to producers on farms for which payment yields and base acres are established."' *Wilson,* 296 B.R. at 811 (citing 7 U.S.C. § 7913(a)). Similarly, under the counter-cyclical portion, for crop years 2002 through 2007, the Secretary of Agriculture "shall make counter-cyclical payments to producers on farms for which payment yields and base acres are established with respect to the covered commodity ...." 7 U.S.C. § 7914(a).[7]

In both portions of the DCP, eligibility for payments depends on the establishment of "base acres" and "payment

---

rity Agreement. A review of the complete Security Agreement indicates that this agreement specifically covers any and all U.S. government agricultural payments then existing or thereafter acquired by Debtors, which includes the 2003 government payments at issue here. This is also true of the relevant financing statements. Therefore, the Court will not look to extrinsic evidence outside of the "four corners" of those documents. *See Coble v. Sexton,* 71 Ark.App. 122, 125, 27 S.W.3d 759, 761 (Ark.App.2000) (citation omitted) ("When contracting parties express their intention in a written instrument in clear and unambiguous language, it is our duty to construe the written agreement according to the plain meaning of the language employed."). As stated above, such "after-acquired property" clauses are permitted under the Arkansas law of secured transactions. *See* Ark.Code Ann. 4–9–204(a); *see also Toombs,* at *3.

5. *See* Christopher R. Kelley, *Introduction to Federal Farm Program Payment Legislation*

*and Payment Eligibility Law,* 2002 Ark. L. Notes 11, 19 (2002) (footnote omitted) (noting that agriculture department employees described portions of rules governing farm payments as "too complicated to fully understand" and that current rules are even more complicated, as well as discussing the emotional toll taken on farmers "who try to stay within the rules without fully understanding them.").

6. Although Union Planters' brief discusses Loan Deficiency Payments, the FSA assignment form submitted to the Court only indicates that payments were made under the DCP. Therefore, this Order only addresses payments under the DCP.

7. "[Counter-cyclical payments] are [also] dependant on a determination that prices for a commodity have not met 'target' prices." *Wilson,* 296 B.R. at 811 (citing 7 U.S.C. § 7914(a)).

yields." Base acres are calculated based on one of the following at the election of the farmer: a 4-year average of acreage planted in crop years 1998—2001, acreage not planted during crop years 1998—2001 due to natural disaster or other circumstance beyond the control of the farmer, or the sum of the contract acreage used to calculate the farm's fiscal 2002 year payment and the 4-year average (years 1998-2001) of eligible oilseed acreage. 7 U.S.C. § 7911(a)(1); 7 C.F.R. § 1412.201. Payment yields are also calculated based on years prior to 2003. *See* 7 U.S.C. § 7912; 7 C.F.R. §§ 1412.301-303.

In making these calculations, no reference is made to crops planted in 2003. In fact, the calculation methods in these statutes and regulations indicate that entitlement to government payments under both direct and counter-cyclical payments is based on past, not current, production. *Accord* Kelley, 2002 Ark. L. Notes at 16 n. 26 (noting that, under 2002 Farm Bill, direct payments are based on historical production of covered commodities not current production and that "counter-cyclical payments are also de-coupled from current production . . . ."). Additional regulations related to the 2002 Farm Bill serve to further support this proposition. These regulations define DCP "cropland" as "land which currently meets the definition of cropland," and the definition of "cropland" encompasses both land which is currently being tilled, as well as land which is not currently being tilled, but which had been tilled in a prior year. *See* 7 C.F.R. §§ 718.2(b)(5) and 718.2(a).

Turning to the facts in this case, it is clear, based on the submissions of the parties, that Debtors have a history of past farm production. Given the above-referenced methods of determining eligibility for government payments under the DCP and definition of "cropland," the right to government payments is based on past

production of covered commodities, and current production is not required. Although there is a dearth of case law regarding the 2002 Farm Bill payment programs, the Court did uncover one case addressing direct payments where the trustee asserted (and the debtors did not dispute) that the debtors' entitlement to direct payments was based solely on 2002 crop farming and "that having crop acres in 2003 was not a prerequisite for receiving the payments." *Wilson,* 296 B.R. at 811–12, *rev'd on other grounds,* 305 B.R. 4 (N.D.Iowa 2004). Therefore, based on the nature of the DCP payments, the Court finds Debtors' entitlement to DCP payments arose based on historical production and was independent of Debtors' crop planting in March of 2003. The DCP payment entitlement accrued to Debtors upon the completion of the FSA assignment document in October 2002. Union Planters' security interest attached at that time, since that is when all the requirements for attachment were met. *See* Ark.Code. Ann. § 4–9–203(b).

The Court's finding that the right to payment under the DCP is decoupled from current crop production is in accord with decisions of Eighth Circuit Court of Appeals. In finding that similar government agriculture payments were not "proceeds" of crops, the Eighth Circuit reasoned that "[those government agriculture payments] are based on the contract rights having origin in the statutory and regulatory fabric of the farm support program, rather than upon the marketing of the crop." *Kingsley v. First American Bank of Casselton (In re Kingsley),* 865 F.2d 975, 980 (8th Cir.1989). Further discussion of the impact of the *Kingsley* decision follows in Part III of this Order.

### III. *Perfection of Union Planters' Security Interest*

■ Having found that Union Planters has a security interest in the DCP pay-

ments, the next question before the Court is whether Union Planters properly perfected its security interest which attached in October 2002. Under Arkansas law the proper location for the filing of a financing statement rests on the nature of collateral at issue. *See generally* Ark.Code Ann. § 4–9–501.

In this case, Union Planters caused financing statements covering the government payments at issue here to be filed with the offices of the circuit clerks for Craighead County and Jackson County, Arkansas. Relying on Ark.Code Ann. § 4–9–501(a)(2), Union Planters argues "[b]ecause debtors were engaged in a farming operation, Union Planters properly filed its UCC–1s in Craighead and Jackson Counties, Arkansas, the counties where the debtors were located. Therefore Union Planters' security interest was properly perfected with respect to debtors right to receive 2003 government payments." Union Planters' Brief at 8. However, having a farming operation alone is not enough to render the code section cited by Union Planters applicable to this situation; the type of collateral at issue must also be examined. Ark.Code Ann. 4–9–501(a)(2) provides that the proper office in which to file a financing statement to perfect a security interest is "the office of the circuit clerk in the county in which the debtor is located in this state if the debtor is engaged in farming operations **and the collateral** is equipment used in farming operations, or farm products, or accounts arising from the sale of farm products." (emphasis added). For this provision to apply, a plain reading of the statute indicates that the debtor must be engaged in farming operations **and** the collateral must be of the type specified.

Although Debtors in this case are engaged in farming operations, satisfying the first part of the statute, the Court must examine whether the 2003 government payments constitute the type of collateral specified in Ark.Code Ann. § 4–9–501(a)(2) or constitute another type of collateral, requiring central filing with the office of the Arkansas Secretary of State for perfection.

■■ As stated in Part I of this Order, Arkansas law controls the determination of whether a security interest is properly perfected and the characterization of the type of collateral. The definitions of "equipment," "farm products," and "accounts" are contained respectively at Ark. Code Ann. §§ 4–9–102(a)(33), (34), and (2). Clearly, the government payments at issue here do not fall under the definition of "equipment." *See* Ark.Code Ann. §§ 4–9–102(a)(33), (44). Even if the 2003 government payments are characterized as "accounts" under Ark.Code. Ann. § 4–9–102(a)(2), those payments do not arise "from the sale of farm products," since no sale was necessary in order to acquire those government payments. Therefore, the only way in which Ark.Code Ann. § 4–9–501(a)(2) would apply is if these government payments are "farm products" or "proceeds" thereof. The term "farm products" itself is defined, in relevant part, as "crops grown, growing, or to be grown" or "products of crops or livestock in their unmanufactured states." Ark.Code Ann. § 4–9–102(a)(34). "Proceeds" are defined in part as "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; [or] (C) rights arising out of collateral ...." Ark.Code Ann. § 4–9–102(a)(64).

A plain reading of the relevant definitional provisions of the Arkansas version of the UCC indicates that the definitions most applicable to the government payments at issue in this case are that of

"accounts" or "general intangibles." *See* Ark.Code Ann. §§ 4–9–102(a)(2), (42). Therefore, Ark.Code Ann. § 4–9–501(a)(2) does not apply to govern the location for filing a financing statement for perfection of a security interest in DCP payments. The case law, sparse though it may be, confirms this conclusion.

Since there appear to be no Arkansas state cases defining the status of government agricultural payments in relation to the Arkansas version of the UCC, the Court will examine cases applying similar state UCC provisions and discussing government payment programs similar to the ones at issue in this case. In *Kingsley,* the Court of Appeals for the Eighth Circuit found that prior government agricultural payments for price support (deficiency payments) and for the nonplanting of crops (diversion payments) were not crop proceeds under the North Dakota version of the UCC. *Kingsley,* 865 F.2d. at 979–982; *see also Bank of North Arkansas v. Owens,* 884 F.2d 330 (8th Cir.1989) (federal Dairy Termination Program payments not "proceeds" from sale of dairy herd under Arkansas version of UCC). As stated previously in this Order, the Eighth Circuit reasoned that "[those government agriculture payments] are based on the contract rights having origin in the statutory and regulatory fabric of the farm support program, rather than upon the marketing of the crop." *Kingsley,* 865 F.2d at 980; *see also Bank of North Arkansas,* 884 F.2d at 333. In fact, the Eighth Circuit further characterized the deficiency and diversion payments, which are similar to the ones at issue here, as accounts or general intangibles. *See Kingsley,* 865 F.2d at 981 ("[T]here appears to be no dispute with [a prior Eighth Circuit ruling] that rights to government farm payments are either accounts or general intangibles under the U.C.C. . . . ."). In addition, similar to the DCP, in the deficiency payment program

at issue in *Kingsley,* albeit under limited circumstances, "[deficiency payments] can take into consideration a percentage of the preceding year farm program payment year." *Id.* at 980 (citations omitted).

In light of the parallels between the agricultural payment programs at issue in the case at bar and those contained in Eighth Circuit cases cited herein, particularly *Kingsley,* as well as the similarity of the Arkansas UCC provisions at issue to those of North Dakota, the Court find the rationale in *Kingsley* persuasive and equally applicable to this case.

Accordingly, based on the above-referenced characterization of collateral at issue here, the applicable provision to determine the place of proper filing of a financing statement is Ark.Code Ann. § 4–9–501(a)(3), not Ark.Code Ann. § 4–9–501(a)(2) as argued by Union Planters. Ark.Code Ann. § 4–9–501(a)(3) requires that "in all other cases" a financing statement be filed with the office of the Secretary of State for proper perfection. *See also* Eldon H. Reiley, *Security Interests in Personal Property,* § 25:28 (Agricultural Entitlements) ("For perfection, [the applicable U.C.C. provision] makes a distinction between general intangibles generally (central filing) and general intangibles 'arising from or relating to the sale of farm products by a farmer' (local filing). To avoid litigation over whether an entitlement relates to the sale of farm products, filing should be both local and central in jurisdictions that follow the second or third alternative versions of [the applicable U.C.C. provision.]").

Since Union Planters did not file their financing statements centrally with the Secretary of State, Union Planters' security interest in the 2003 government payments was not properly perfected prior to the filing of the instant case.

## IV. Effect of Failure to Perfect under Bankruptcy Code

 Having determined that Union Planters did not properly perfect its security interest in the 2003 government payments, the Court now turns to the effect of this failure to perfect under the Bankruptcy Code. Debtors, as debtors-in-possession under 11 U.S.C. § 1107(a), are "invested with the powers of the trustee." *Saline State Bank v. Mahloch,* 834 F.2d 690, 694 n. 9 (8th Cir.1987). "Under 11 U.S.C. § 544(a), the debtors, as debtors-in-possession, have the status of judicial lienholders, with priority over liens that have not been perfected." *In re Branderhorst,* 843 F.2d 311, 312–13 (8th Cir.1988). More specifically, "the substance of the trustee's rights [in this case, Debtors' rights] as judicial lien creditor—primarily the priority of his claim in relation to other interests in the property—is determined by reference to state law," but the Bankruptcy Code prescribes the consequence of that priority, which under 11 U.S.C. § 544, may be avoidance of Union Planters' security interest. *In re Bell,* 194 B.R. 192, 195 (Bankr.S.D.Ill.1996) (citations omitted).

 Arkansas law states that a lien creditor has priority over an unperfected security interest. Ark.Code Ann. § 4–9–317(a)(2)(A) (a security interest is subordinate to one who becomes a lien creditor prior to perfection of such security interest). "Courts enforce the trustee's avoidance powers over an unperfected security interest when the party claiming a security interest improperly files locally, rather than centrally." *In re K & A Servicing, Inc.,* 47 B.R. 807, 813 (Bankr.N.D.Tex. 1985) (citations omitted); *see also In re Davis,* 274 B.R. 825 (Bankr.W.D.Ark.2002) (creditor's erroneous filing of financing statement in wrong county rendered security interest unperfected under Arkansas law and subject to lien avoidance by trustee). Therefore, in the case at bar, the consequence of Union Planters' failure to properly perfect its security interest in the 2003 government payments is that Debtors may avoid Union Planters' security interest in accordance with 11 U.S.C. § 544.[8]

 Although the filing of an adversary proceeding is generally necessary for the avoidance of a lien, "when such lien 'issue' is ancillary or incidental to another 'larger,' primary issue, the Court holds it has the authority to consider the issue if it believes that to do so would be in the interests of justice and judicial efficiency and can be accomplished without depriving any party or claimant of its procedural due process protections." *In re Swizzlestick, L.L.C.,* 253 B.R. 264, 267 (Bankr.W.D.Mo. 2000) (citations omitted). In this case, Debtors requested in their Amended Application to Incur Debt that Union Planters' security interest be avoided. Moreover, the parties fully briefed the issue of

---

8. Provisions of 11 U.S.C. § 552(a) (regarding security interests in after-acquired property) and § 364(d) (regarding incurring debt senior or equal in priority to an existing lien) which would generally be relevant to the Debtors' applications to incur debt are not applicable in this case, since Union Planters' lien is unperfected and therefore avoidable. Although Union Planters cites *In re Endicott,* 239 B.R. 529 (Bankr.E.D.Ark.1999) and *In re Norville,* 248 B.R. 127 (Bankr.C.D.Ill.2000) in support of its arguments under 11 U.S.C. § 552, the Court notes that in those cases, unlike the case at bar, the courts held that creditors had properly perfected their liens pre-petition. In addition, *Endicott* was decided prior to the extensive 2001 amendments to the Arkansas version of the UCC. *See* Susan A. Schneider, *Notes on Agricultural Landlord's Liens under Revised Article 9 of The Uniform Commercial Code,* 2002 Ark. L. Notes 53 (2002) (noting that Arkansas adopted most of the revisions to Article 9 of the UCC in 2001 and that these revisions "represent the most significant changes proposed to overall secured transaction laws since 1972.").

Union Planters' security interest in the 2003 government payments at issue, and Debtors specifically argued that 11 U.S.C. § 544 applies in this case. *See* Debtor's Brief at 2. Since issues regarding the status of Union Planters' security interest and avoidance of any lien stemming from that interest were raised in the submissions of the parties, the Court finds that, although no adversary proceeding was filed, it is in the interest of justice and judicial efficiency to rule on avoidance of Union Planters' lien at this juncture. The Court also finds, in light of the foregoing, that such a ruling can be accomplished without depriving any party of its procedural due process protections.

Accordingly, it is hereby

**ORDERED** that Union Planters' lien on the 2003 government payments from the Direct and Counter-cyclical Program is **AVOIDED.** It is also

**ORDERED** that Debtors' Application to Incur Debt and Amended Application to Incur Debt are **GRANTED** to the extent that Debtors have requested to use the 2003 government payments from the Direct and Counter-cyclical Program as collateral for the 2003 crop operating loan. It is also

**ORDERED** that Union Planters' Objection to Application for Authority to Incur Debt is **OVERRULED** to the extent that it objects to the use of the 2003 government payments from the Direct and Counter-cyclical Program as collateral for the 2003 crop operating loan.

**IT IS SO ORDERED.**