EDITH H. JONES, Chief Judge, joined by JERRY E. SMITH, RHESA HAWKINS BARKSDALE, EMILIO M. GARZA, DeMOSS, EDITH BROWN CLEMENT and OWEN, Circuit Judges,
dissenting from the majority opinion:
The issue posed in this case is whether federal agriculture disaster payments, enacted by Congress to compensate farmers for crops planted but destroyed by drought or flood, are included within a farmer’s Chapter 7 bankruptcy estate when the federal law was enacted after the bankruptcy filing. Because we disagree with the majority’s resolution of this issue, we respectfully dissent.
A debtor’s bankruptcy estate comprises, inter alia, “all legal or equitable interests of the debtor in property as of the commencement of the case,” and “proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.” 11 U.S.C. § 541(a)(1),(6). We would hold that these definitions, whether interpreted in light of venerable bankruptcy case law or state commercial law, are sufficiently broad to encompass the disaster payments made to Burgess. Further, excluding the payments from the bankruptcy estate creates irreconcilable tension with other Bankruptcy Code provisions and goals.

I. Background

Edward Keith Burgess is a Louisiana farmer who filed for Chapter 7 bankruptcy on August 2, 2002. He received a discharge on December 5, but entered into a reaffirmation agreement covering a debt of $59,392.32 owed to Farm Service Agency (FSA), which held a secured mortgage on Burgess’s home.
On February 20, 2003, federal legislation known as the Agricultural Assistance Act of 2003 (the Act) was signed into law. The Act provided for assistance to farmers who suffered losses due to weather-related disasters or other emergency conditions which affected their 2001 or 2002 crops. Farmers became eligible to apply for disaster payments on June 21, 2003. Sometime in July, 2003, Burgess filed an application for payment of a 2001 crop loss with *509 the FSA, which administered the Act. The FSA ultimately issued a check in the amount of $24,829 for Burgess’s claimed losses, but the check was mailed to the bankruptcy trustee who, upon receipt of such check, filed a motion to reopen Burgess’s Chapter 7 case in order to arrange for the administration of the proceeds of the claim check. The bankruptcy- court entered an order on July 29, 2003, reopening Burgess’s Chapter 7 proceeding. On July 30, 2003, Burgess filed a “Motion for Turnover of Funds” in the bankruptcy court, asserting that the FSA payment was not property of the bankruptcy estate and should therefore be turned over to him.
The bankruptcy court denied Burgess’s motion, and the district court, on appeal, affirmed. A panel of this Circuit then reversed, Burgess v. Sikes, 392 F.3d 782 (5th Cir.2004), holding that Burgess’s disaster relief payments constituted postpe-tition property and were not part of the bankruptcy estate. This court agreed to rehear the case en banc, 403 F.3d 323 (5th Cir.2005).

II. Discussion

11 U.S.C. § 541, entitled “property of the estate,” embodies the essence of the Bankruptcy Code. Sweeping all of the debtor’s property into the bankruptcy estate created at filing is the means by which the Code achieves effective and equitable bankruptcy administration. Only through a comprehensive administration of the debtor’s property, wherever located and by whomever controlled, can the court shield the property from creditors’ unauthorized grasp; prevent harassment of debtors; and ultimately ensure equal distribution among creditors. See generally 5 CollieR on BaNKRuptCY § 541.01(a)(1) (15th Ed. Rev.2002).
Section 541 accordingly describes property of the estate in the broadest possible terms: “all legal or equitable interests of the debtor as of the commencement of the case.” 11 U.S.C. § 541(a)(1) “By including all legal interests, without exception, Congress indicated its intention to include all legally recognizable interests although they may be contingent and not subject to possession until some future time.” Rau v. Ryerson (In re Ryerson), 739 F.2d 1423, 1425 (9th Cir.1984)(citing H.R.Rep. No. 95-595, at 175-76 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6136); see also In re Kemp, 52 F.3d 546, 550 (5th Cir.1995) (“The conditional, future, speculative, or equitable nature of an interest does not prevent it from being property of the bankruptcy estate”); In re Yonikus, 996 F.2d 866, 869 (7th Cir.1993) (“[Ejvery conceivable interest of the debtor, future, non-possessory, contingent, speculative, and derivative, is within the reach of § 541(a).”). Similarly, “proceeds of the estate”, . § 541(a)(6), cover all conceivable postpetition returns yielded by the debt- or’s property. Finally, § 541 includes interests in marital property (§ 541(a)(2)), and in property acquired or generated by the estate postpetition pursuant to other sections of the Bankruptcy Code (§§ 541(a)(3) and (4)); and it sweeps in property interests, acquired within one hundred eighty days after bankruptcy, from inheritances, divorce settlements, or life insurance policies (§ 541(a)(5)).
Taken as a whole, § 541 is far more conspicuous for what it includes as the estate’s property than for what it explicitly excludes. Section 541(a)(6) excludes wages earned postpetition, and § 541(a)(7) excludes divorce settlements, inheritances, and life insurance proceeds received more than one hundred eighty days postpetition. Because there is no specific reference to the debtor’s after-acquired payments from federal agriculture disaster programs, and Congress has not specified in this instance *510 that such payments are immune from the claims of creditors, interpretation of the Bankruptcy Code, in light of guiding case law, is necessary.
The Supreme Court has recognized that what is included in property of the debt- or’s estate may represent federal policy implementing the Bankruptcy Code, Segal v. Rochelle, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966), but in the absence of such policy, state law generally determines what interest a debtor has in property. Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 917-18, 59 L.Ed.2d 136 (1979). We need not definitively resolve whether federal or state law controls the question in this case. See Johnson, Blakely, Pope, Bokor, Ruppel, & Burns, P.A. v. Alvarez (In re Alvarez), 224 F.3d 1273, 1276 (11th Cir.2000). From either perspective, the federal disaster payments for which Burgess qualified should be included within his bankruptcy estate.

A. The Bankruptcy Policy Approach.

The Supreme Court has routinely concluded that, to fulfill the purposes of bankruptcy law, the definition of property of the debtor’s estate must be broadly interpreted. See United States v. Whiting Pools, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). In Whiting Pools, § 541(a)(1) was held to encompass property that had been seized by a creditor (IRS) before the debtor filed bankruptcy. Thus, as of “the commencement of the case”, the debtor no longer possessed the property. Noting that § 541(a)(1) defines the debt- or’s estate to include property “as of the commencement of the case,” the court observed:
although [this provision] could be read to limit the estate to those “interests of the debtor in property” at the time of the filing of the petition, we view [it] as a definition of what is included in the estate, rather than as a limitation.
Id. at 203, 103 S.Ct. at 2312. The Court found its interpretation necessary to effectuate other provisions of the Bankruptcy Code and consistent with longstanding practice under the preceding bankruptcy statute. Moreover, in both text and footnote, the Court subscribed to the “broad” definition of property referenced in the Congressional history relating to the Bankruptcy Code.[1] Id. at 203-05, 103 S.Ct. at 2312-14. The Court’s interpretation of property of the estate eschews a rigid temporal limitation on § 541(a)(1) and confirms that Congress enacted at least as broad a definition of that seminal term as pre-existed in the Bankruptcy Act. Congress, in turn, is presumed to have enacted the Bankruptcy Code against a background understanding of the Court’s prior construction of “property of the estate.” Several earlier authorities are relevant here.
The first such case, Segal v. Rochelle, is explicitly mentioned in the legislative history of the Bankruptcy Code. See S.Rep. No. 95-989, at 82 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R.Rep. No. 95-595, at 367 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6323. Segal holds that an income tax refund claim based on events that predated bankruptcy but as- *511 sertable only post-filing, at the end of the tax year, constituted property of the debt- or’s estate under the Bankruptcy Act. The Supreme Court acknowledged the impossibility of categorically defining “property,” while observing that the purposes of the Bankruptcy Act must ultimately govern. The first purpose is to secure for creditors
everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term “property” has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.
Segal, 382 U.S. at 379, 86 S.Ct. at 515. Because another prominent purpose of the Act is to afford a fresh start, “future wages of the bankrupt do not constitute ‘property’ at the time of bankruptcy, nor analogously, does an intended bequest to him or a promised gift-even though state law might permit all of these to be alienated in advance.” Id. at 379-80, 86 S.Ct. at 515. The Court concluded, however, that the loss carry-back refund claim in the case was “sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts’ ability to make an unencumbered fresh start that it should be regarded as ‘property’ under § 70a(5).” Id. at 380, 86 S.Ct. at 515.[2]
Segal affirms that a loss extant on the date of bankruptcy can later yield property includable in the debtor’s estate, as it disavowed the lower courts’ reasoning to the contrary:
[B]oth the First and Third Circuits reasoned that prior to the year’s end a loss-carryback refund claim was too tenuous to be classed as “property” which would pass under § 70a(5).... Both circuits felt the result to be unfortunate, not least because the very losses generating the refunds often help to precipitate the bankruptcy and injury to the creditors, but both believed the statutory language left no option.
Id. at 378, 86 S.Ct. 511.
An earlier Supreme Court case presages Segal and is factually similar to the case at bar. In Williams v. Heard, 140 U.S. 529, 11 S.Ct. 885, 35 L.Ed. 550 (1891), a debtor suffered economic injury by paying enhanced war risk insurance premiums during the Civil War. Although the injury was non-compensable at the time of the debtor’s bankruptcy in 1875, the injury thereafter became compensable by an act of Congress in 1882. Before passage of the legislation allowing such claims, the Court stated, “no individual claimant had, as a matter of strict legal or equitable right, any lien upon the fund awarded, nor was Congress under any legal or equitable obligation to pay any claim.” Id. at 538,11 S.Ct. 885. Nevertheless, the Court found the claim to be property of the bankruptcy estate, reasoning as follows:
... [Wjhile the claimant was remediless with respect to any proceedings by which he might be able to retrench his losses, nevertheless there was at all times a moral obligation on the part of the government to do justice to those who had suffered in property.... There was thus at all times a possibility that the government would see that [the claims] were paid. There was a possibility of their being at some time valuable. *512 They were rights growing out of property; rights it is true, that were not enforceable until after the passage of the act of congress for the distribution of the fund. But the act of congress did not create the rights. They had existed at all times since the losses occurred. They were created by reason of losses having been suffered. All that the Act of Congress did was to provide a remedy for the enforcement of the right.
Id. at 541, 11 S.Ct. 885.[3]
These cases ascribe a broad, non-conventional scope to the definition of property of the estate in order to fulfill the goals of bankruptcy law. Thus, even a prepetition loss of the debtor’s property may itself constitute property when subsequent events afford a recovery for the loss. Resolution of Burgess’s case seems straightforward under Whiting Pools, Segal and Williams. Burgess invested in his crops, planted them and awaited a harvest until a weather-related disaster destroyed them. He suffered a loss. At the time of his loss there was “an expectancy of interest,” “a possibility coupled with an interest,” that the crop loss could be compensable in the future. That potential, as the Supreme Court held in Williams, is a property right, and under Segal, the right is sufficiently rooted in the prebankruptcy past as to become property of the bankruptcy estate.
The majority opinion disagrees with the foregoing interpretation of the Bankruptcy Code by the Supreme Court cases. The majority opinion focuses on the temporal limitation in § 541(a)(1), which it constructs as an iron curtain separating pre-bankruptcy property from whatever accrues to the debtor post-bankruptcy. The majority reads the cases to require that a prebankruptcy loss must have more than a mere hope or expectancy of recovery, and must in fact give rise to a prebankruptcy legal claim, in order for post-bankruptcy recovery for that loss to become part of the bankruptcy estate. This view has some force, but we respectfully reject its rigidity.
First, the majority opinion overlooks Whiting Pools, which construed the temporal limitation in § 541(a)(1) as a statement of inclusion, not limitation.
Second, the majority both minimizes and reinterprets Segal. Segal expressly holds that a prebankruptcy loss can give rise to a claim that becomes property of the debt- or’s estate. The majority opinion minimizes Segal, implying that its formulation has been superseded by the express terms of the Bankruptcy Code. There is little or no support for this conclusion.[4] Not only *513 was the holding of Segal approved in the legislative history concerning § 541, see supra, but its test to determine when after-acquired property is included in the bankruptcy estate has been cited repeatedly by courts construing the Bankruptcy Code.[5]
The majority opinion also misperceives Segal to require that the debtor had an enforceable legal right prebankruptcy in order for a post-bankruptcy claim to accrue to the debtor’s estate. Segal expresses no such requirement. The Supreme Court did, however, emphasize the contingent nature of any repayment that -the debtor might ultimately receive and the origin of any tax refund in prebankruptcy events. Segal, 382 U.S. at 379-81, 86 S.Ct. at 515-16.[6] Both of those conditions exist in the case before us, and in other cases that rest on Segal.
While it is indisputable, for instance, that a cause of action belonging to the debtor at the date of bankruptcy constitutes property of the estate, notwithstanding that its monetary realization may be subject to both legal and factual contingencies, see, e.g., La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition), 832 F.2d 1391 (5th Cir.1987), bankruptcy courts relying on Segal have gone further. Courts have held that a cause of action not fully accrued under state law at the date of filing could be sufficiently rooted in the prebankruptcy past to be includable in the debtor’s estate. In one such case, the debtor was exposed to asbestos for many years before he filed bankruptcy but was not diagnosed with asbestosis until seven months postpetition. See In Re Richards, 249 B.R. 859 (Bankr.E.D.Mich. 2000). Relying on Michigan law, which does' not afford an actionable claim for asbestosis until the diagnosis is actually made, the debtor asserted that the accrual date under state law is determinative, hence his claim should be excluded from the bankruptcy estate. The court rejected this contention, because, “[a]s noted, the appropriate inquiry is whether the claim is sufficiently rooted in the pre-bankruptcy past.” Id. at 861 (citing Segal). Richards explained that while the disease had begun and progressed before bankruptcy, its diagnosis afterwards was “more a result of happenstance than medical necessity.” Id.
Another recent case ordered inclusion in the bankruptcy estate of a claim for bad faith refusal to defend an insured, where notice of the underlying insurance claim was given prepetition, but the debtor did not request, nor did the insurer refuse *514 indemnification until more than eight months postpetition. Field v. Transcontinental Ins. Co., 219 B.R. 115, 119 (E.D.Va.1998), aff'd, 173 F.3d 424 (4th Cir.1999). The district court acknowledged as a “difficult question” whether the debtor had any prepetition cause of action. The court, however, found it unnecessary to resolve the question “because the bankrupt’s estate includes not only claims that had accrued and were ripe at the time the petition was filed, but also those claims that accrued post-petition, but that ‘are sufficiently rooted in the pre-bankruptcy past.’ ” Id. (quoting Segal). The postpe-tition bad faith refusal claim met this test.
As a final example, claims for legal malpractice rendered in connection with bankruptcy filings have been held includable in the debtor’s estate based on the Segal formulation and irrespective of whether they had technically accrued prepetition under state law. See In re Alvarez, 224 F.3d at 1276; Winick & Rich, P.C. v. Strada Design Assocs. (In re Strada Design Assocs.), 326 B.R. 229 (Bankr.S.D.N.Y.2005); In re Tomaiolo, 205 B.R. 10 (Bankr.D.Mass.1997), aff'd, 2002 WL 226133, 2002 U.S. Dist. LEXIS 2038 (E.D.Mass. Feb. 6, 2002).[7]
In all of the foregoing cases, Segal was brought to bear despite the absence of a mature legal claim at the date of bankruptcy, yet each claim was so factually connected to the prepetition period as to justify its inclusion in the debtor’s estate.[8]
One court of appeals decision supports the view that federal disaster payments authorized by legislation that post-dates a farmer’s bankruptcy do not become property of the debtor’s estate. Drewes v. Vote (In re Vote), 276 F.3d 1024 (8th Cir.2002). There, the court held that the debtor’s “mere hope” of receiving federal payments at the date of filing could not transform his losses into a legally enforceable claim or the subsequent disaster relief payments into property of the bankruptcy estate. Id. at 1026-27. Vote mistakenly interpreted Segal to depend on the debtor’s preexisting legal right to a tax refund rather than on the facts that rooted the debtor’s claim sufficiently in the prebankruptcy past. Further, Vote failed to cite Williams or Whiting Pools, and it declined to address, as waived, whether the payments could represent proceeds of the crop loss pursuant to § 541(a)(6).[9]
Both Vote and the majority opinion share the view that where a debtor has only a “mere hope” (prepetition) of reeeiv- *515 ing federal payments based on statutes enacted post-bankruptcy, that hope is too nebulous or contingent to be treated as property of the debtor’s estate. The majority opinion states: “were the law otherwise, any post petition legislation or contract could retroactively create property of the estate,” thus eviscerating the temporal limitation in § 541(a)(1). We disagree. Whiting Pools specifically de-emphasizes the temporal limitation on § 541(a)(1). Further, Segal’s formulation ensures that later-generated property will be included in the debtor’s estate only if it is “sufficiently rooted in the pre-bankruptcy past.” The eases described above demonstrate that Segal effects no transformation of the Bankruptcy Code, but, like Whiting Pools, allows a principled and pragmatic inclusion of property generated largely by events predating bankruptcy. Segal readily applies to disaster payments for which Burgess would have had no claim at all but for (1) prebankruptcy investment of his money and labor to plant and tend the crops; (2) the connection between the disaster payments and the crop-related debts and losses that played a significant role in precipitating his bankruptcy; and (3) Congress’s correlation of disaster payments to estimated crop proceeds that would assist farmers to repay their local creditors. Finally, placing these payments in Burgess’s bankruptcy estate prevents his receiving a fortuitous windfall unavailable to other farmers who failed to file bankruptcy until after the law was passed.[10]
The disaster payments may alternatively be characterized as “proceeds” “of or from” the lost crops under § 541(a)(6). There is no temporal limitation on proceeds that accrue to the bankruptcy estate.[11] Interpreting “proceeds” broadly follows the Code’s legislative history, which describes this term as broader than the U.C.C. definition. See 5 Collier on Bankruptcy^ 541.17, at § 541.90 (“... [T]he scope of 541(a)(6) is not limited to [the U.C.C.] definition and will extend beyond it.”). The majority opinion rejects the proposition that relief payments could represent proceeds of the lost crops because, “for the [§ 541(a)(1) ] temporal limitation [on estate property] to have any meaning at all, Burgess must have had a prepetition interest in the disaster relief payment, not the crop loss.” This view is vulnerable for several reasons. First, § 541(a)(6) requires only that proceeds be “of or from” property of the estate. The statutory language suggests no more than a but-for connection of the proceeds to the prebankruptcy estate, a connection clearly present in this case. Further, in connecting proceeds to “property of the estate”, § 541(a)(6) sweeps in, conspicuously without any temporal limitations, not only property included under § 541(a)(1) but *516 other estate property defined in all the other pertinent subsections of § 541(a). The majority interpretation thus unnaturally constrains § 541(a)(6). Finally, the majority interpretation goes against common sense. A crop loss is quantifiable. The federal disaster payments to Burgess reimbursed him for the crop loss according to its putative market value. Farm Service Agency, Agricultural Assistance Act of 2003 (Apr.2003), http://www.fsa. usda.gov/pas/publications /facts/ html/disa-sact03a.htm. The payments are a functional substitute for the proceeds that Burgess could have earned from selling the crops. That there was no extant legal vehicle to recover disaster payments when bankruptcy was filed does not render the payments a gratuity, especially where, had bankruptcy been filed post-enactment of the statute, the payments would clearly have been proceeds.
The majority opinion relies heavily on recent decisions that, following Vote, refused to include federal disaster payments in the bankruptcy estate. See, e.g., Bracewell v. Kelley (In re Bracewell), 322 B.R. 698 (M.D.Ga.2005). Earlier cases, however, including several overlooked by Vote and Bracewell, tended to conclude that disaster payments are proceeds of lost crops under § 541(a)(6) and under the U.C.C. See, e.g., In re Schneider, 864 F.2d 683, 685 (10th Cir.1988) (agricultural entitlement payments arising from lost crops “are proceeds of that crop” under § 541(a)(6)). Schneider discussed In re Schmaling, 783 F.2d 680, 682-83 (7th Cir.1986), in which the appeals court, ruling in a bankruptcy context, explained that federal disaster payments, for crops that were planted but thereafter lost, constitute proceeds under former U.C.C. § 9-306(2) (now set forth in revised U.C.C. § 9-315). Schmaling, in turn, relied on In re Kruse, 35 B.R. 958 (Bankr.D.Kan.1983) and In re Nivens, 22 B.R. 287 (Bankr.N.D.Tex.1982), both of which included disaster payments within the bankruptcy estate as “proceeds.” [12] The majority opinion dismisses two other cases holding that crop disaster payments are proceeds under § 541(a)(6) on the basis that in each of them, the authorizing legislation passed Congress before the debtor declared bankruptcy. Kelley v. Ring (In re Ring), 169 B.R. 73 (Bankr.M.D.Ga.), aff'd, 160 B.R. 692 (M.D.Ga.1993); Boyett v. Moore (In re Boyett), 250 B.R. 817, 822 (Bankr.S.D.Ga. 2000). Ring does not turn on the enactment date of the disaster payment program. Boyett relies on both § 541(a)(1) and (a)(6), and mentions the statute’s date of passage as an element, but not a prerequisite of its conclusion. Further, In re White, No. BRL88-00971C, 1989 WL 146417 (Bankr.N.D.Iowa Oct.27, 1989), included in the debtor’s estate disaster payments authorized by statute postdating the bankruptcy. See also FarmPro Servs., Inc. v. Brown (In re FarmPro Servs.), 276 B.R. 620 (D.N.D.2002) (disaster payments are proceeds under § 541(a)(6)).[13]
Construing property of the estate and proceeds broadly under federal law accords with Whiting Pools, Segal, and Williams and yields the conclusions that Burgess’s lost crops were “property”; his *517 claim for disaster payments was rooted in the prebankruptcy past by its tie to the lost crops; and the payments are “proceeds” of the crops.

B. State Law Approach

Because property interests are ordinarily created and defined by state law, the Supreme Court has declared:
Unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving “a windfall merely by reason of the happenstance of bankruptcy.”
Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918 (1979)(internal citation omitted); see also Barnhill v. Johnson, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992)(in the absence of any controlling federal law, “property” and “interests in property” are creatures of state law (citing Butner)); Nobelman v. Am. Sav. Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). Whiting Pools, Williams, and Segal are not inconsistent with Butner; rather than create property interests, those cases attributed them to the bankruptcy estate as a matter of federal law. Viewing this case solely through the lens of state law affords another, narrower ground of decision, as the question under Butner is whether Louisiana law treats federal disaster payments as proceeds of lost crops. The majority opinion overlooks the Butner approach, yet because of Butner, the interpretation of proceeds in § 541(a)(6) cannot be narrower than that promulgated in state law.
Although there is no case law on point in Louisiana, the state’s version of the U.C.C. provides:
(64) “proceeds” means the following property:
(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
(D) to the extent of the value of collateral, claims arising out of the loss ... or damage to, the collateral ....
La.Rev.Stat. Ann. § 10:9-102(a)(64). Thus, in Louisiana, “proceeds” include whatever is received from a sale or other disposition of collateral, as well as claims arising out of the loss or damage to the collateral. Moreover, in Finova Capital Corp. v. IT Corp., 774 So.2d 1129, 1131-32 (La.Ct.App.2000), a state court of appeals interpreted “proceeds” by reference to a U.C.C. comment that under the provision’s “plain meaning,” a security interest would also “extend ... any rights arising out of the collateral and any claims brought by the debtor for damages to the collateral.”[14] Id. at 1131-32.
An established body of case law treats the U.C.C. definition of proceeds as including federal disaster payments for lost crops.[15] These decisions pragmatically recognize that such payments represent “compensation for already existing plants that had been cultivated through the recipient’s effort.” In re Schmaling, 783 F.2d *518 680, 683 (7th Cir.1986); see also In re Schneider, 864 F.2d 683 (10th Cir.1988); In re Boyett, 250 B.R. 817, 822 (Bankr.S.D.Ga.2000); In re White, No. BRL88-00971C, 1989 WL 146417 (Bankr.N.D.Iowa Oct.27, 1989); In re Kruse, 35 B.R. 958 (Bankr.D.Kan.1983); Conagra, Inc. v. Farmers State Bank, 237 Mich.App. 109, 602 N.W.2d 390 (Mich.App.1999). A Texas bankruptcy case, frequently cited in this connection, explained that, “the disaster payments are merely the substitute proceeds of the crop which logically would have been received had the disaster or low yields not occurred.” In re Nivens, 22 B.R. 287, 291 (Bankr.N.D.Tex.1982). Ni-vens ’s reasoning was adopted by the Texas Supreme Court in Sweetwater Prod. Credit Ass’n, v. O’Briant, 764 S.W.2d 230 (Tex.1988)(holding payment in kind contracts are “proceeds”).[16]
The conclusion of these courts that federal disaster payments constitute U.C.C. proceeds is not universally accepted, but it is the dominant view. See In re Ladd, 106 B.R. 174 (Bankr.C.D.Ill.1989) (disaster payments are not U.C.C. proceeds of lost crops); In re FarmPro Servs., 276 B.R. at 626. See generally Hon. John K. Pearson & Sally Fisher, Revised Article 9 and Government Entitlement Programs, ABI Journal, Oct. 22, 2003, at 24.[17] A reasonable extrapolation based on the text of the U.C.C., and these other courts’ views, is that Louisiana would hold federal disaster payments to be crop proceeds. That being the case, under Butner, they are includa-ble in the bankruptcy estate pursuant to § 541(a)(6).

C. Other Bankruptcy Provisions.

If disaster payments legislated after bankruptcy are neither property of the debtor’s estate because of the “temporal” limitation in § 541(a)(1), nor proceeds pursuant to § 541(a)(6), but are defined in state law as proceeds, absurd consequences could ensue for both debtors and creditors. The majority’s view leads to the conclusion that the unsecured creditors would have no interest in such proceeds under the Bankruptcy Code; the trustee could not administer the recovery and division of such “proceeds;” and a secured creditor would not have to abide by the Bankruptcy Code’s automatic stay and prohibition on interference with the debt- or’s discharge.
On the debtor’s side, the lien creditor of a farmer with an interest in proceeds, which is enforceable in state law on disaster payments irrespective of when the legislation was passed, could claim that the interest is outside the bankruptcy estate altogether and could garnish the debtor’s receipt of such payments. The garnishment would, however, run contrary to the intent of the Bankruptcy Code to free the debtor from such post-filing interferences and credit-ruining activities. See 11 U.S.C. § 362 (automatic stay); § 524 (effects of discharge). On the creditor’s side, 11 U.S.C. § 552, designed to regulate the postpetition effect of prepetition security interests, would be thrown into uncertainty by a holding that federal disaster proceeds are not within the bankruptcy estate at all. Section 552(b)(1) states that a security interest in postpetition proceeds remains en *519 forceable if “applicable non-bankruptcy law” authorizes a security interest in such proceeds, and those “proceeds” are “acquired by the estate after commencement of the case.” The majority position would hold, to the contrary, that disaster payments arising from postpetition legislation could not be “acquired by the estate” because they were never related to the debt- or’s estate property. At a minimum, however, the treatment of proceeds in § 552 must set a floor for the definition of proceeds as estate property in § 541(a)(6).
In sum, federal disaster payments cannot be both fish and fowl for bankruptcy purposes. They are either “proceeds” for all purposes, at least in those states which have classified them as such under the U.C.C., or they are simply covered under the breadth of § 541(a)(6) as proceeds because Congress intended the definition to be at least as broad as that of the U.C.C. The majority view creates intolerable tension with other Bankruptcy Code provisions.
For these reasons, we respectfully DISSENT from the majority opinion reversing and remanding the judgment of the bankruptcy and district courts holding that the federal disaster payments designated to Burgess on account of his crop losses before bankruptcy were includable within the bankruptcy estate pursuant to 11 U.S.C. §§ 541(a)(1) and (6).

. Whiting Pools adopts the result and most of the reasoning of Judge Friendly’s Second Circuit opinion in the same case. There, Judge Friendly described as 'rigid” the government’s narrow, though literalistic, reading of § 541(a)(1). Referring to the congressional history concerning the scope of this provision, Judge Friendly stated: "this discussion indicates that § 541(a)(1) was not intended to narrow the old Act’s definition of 'property of the estate,' as the Government's reading of the statute would require, but preserve or enlarge it.” United States v. Whiting Pools, Inc., 674 F.2d 144, 150 n. 10 (2d Cir.1982).

. The portion of Segal's formulation that inquires whether the after-acquired property is "so little entangled with the debtor’s ability to make a fresh start” is often quoted but hardly ever determinative. The better view of this phrase is that it was eliminated by the Code's express incorporation of exempt property within the debtor’s estate. See In re Ryerson, 739 F.2d at 1426.

. Williams relied on Milnor v. Metz, 41 U.S. 221, 16 Pet 221, 10 L.Ed. 943 (1842), in which the Supreme Court held that wages earned by a worker employed in federal service before he filed bankruptcy, but not reimbursed until an Act of Congress was passed after the bankruptcy, were included in the bankrupt estate. Absent an Act of Congress, Milnor was barred by sovereign immunity from enforcing his claim against the government. Thus, even though the government was his "debtor,” he had no prebankruptcy legal right to recover wages.

. The majoi’ity opinion cites only dictum in a case from this court that the Supreme Court overruled. In re Goff, 706 F.2d 574, 578 (5th Cir.1983), overruled by Patterson v. Shumate, 504 U.S. 753, 112 S.Ct 2242, 119 L.Ed.2d 519 (1992). In re Goff actually concluded that the Bankruptcy Code broadened any preexisting test for property of the debtor's estate. ("The Bankruptcy Code was intended to create a more uniform and comprehensive scope to 'property of the estate’ which is subject to the reach of debtors’ creditors than had previously existed under the old Bankruptcy Act.... The sweeping scope of [the § 541(a)(1)] automatic inclusion was intended to remedy most of the old Act's perceived deficiencies.”)

. See, e.g., In re Alvarez, 224 F.3d 1273, 1278-79 (11th Cir.2000); United States v. Sims (In re Feiler), 218 F.3d 948, 955-56 (9th Cir.2000); Andrews v. Riggs Nat’l Bank of Wash., D.C. (In re Andrews), 80 F.3d 906, 910 & n. 9 (4th Cir.1996) (analyzing postpetition payments under a prepetition non-competition agreement to determine whether they were, as Segal requires, "sufficiently rooted in the pre-bankruptcy past”); In re Yonikus, 996 F.2d 866, 869 & n. 3 (7th Cir.1993); In re Ryerson, 739 F.2d 1423, 1426 (9th Cir.1984); In re Barowsky, 946 F.2d 1516, 1518-19 (10th Cir.1991) (Segal’s holding and analysis of property were adopted in the Bankruptcy Code); Field v. Transcontinental Ins. Co., 219 B.R. 115, 119 & n. 7 (E.D.Va.1998), aff'd, 173 F.3d 424 (4th Cir.1999); Winick & Rich, P.C. v. Strada Design Assocs. (In re Strada Design Assocs.), 326 B.R. 229, 236 (Bankr.S.D.N.Y.2005); In re Richards, 249 B.R. 859, 861 (Bankr.E.D.Mich.2000).

. The majority opinion also asserts that Williams involved compensation for a pre-bankruptcy legal right or claim “against someone.” With due respect, the Supreme Court emphasized the contrary, that no legal or equitable right existed against Congress or the international fund that was earlier collected. Williams, 140 U.S. at 538; 11 S.Ct. 885. Further, because the rights grew out of the debtor's property, by reason of losses having been suffered, the later-enacted Congressional remedy became part of the bankruptcy estate.

. In re Riccitelli, 320 B.R. 483 (Bankr.D.Mass.2005), is not to the contrary. Indeed, the Riccitelli court applied Segal and explicitly noted that the analysis of' whether a malpractice claim is prepetition property "does not turn on whether, under state law, the claim had accrued as of the petition date.” Riccitelli, 320 B.R. at 491 (citing Tomaiolo). The court concluded that this particular malpractice claim was a postpetition asset only because the prepetition roots of the claim were "overwhelmed by significant postpetition events in the accrual of the claim.” Id. at 492.

. The majority opinion heavily relies on the district court opinion in Hoseman v. Weinschneider, 277 B.R. 894 (N.D.Ill.2002), but the circuit court, in affirming the judgment, pointedly refused to "consider such intricate questions of timing,” 322 F.3d 468, 473 (7th Cir.2003). The status of the district court discussion is thus dubious.

.The majority opinion also relies on Sliney v. Battley (In re Schmitz), 270 F.3d 1254 (9th Cir.2001), but that case is readily distinguishable. Schmitz concerned whether fishing rights allocated to a debtor post-petition, but calculated according to his prepetition catch, were property of the estate. The court sensibly held that the fishing rights were not referable to the debtor’s prepetition status. The newly allocated catch permit had nothing to do with the debtor's prepetition investment or losses.

. The fear has been expressed that if Burgess’s federal disaster payments are "sufficiently rooted in the prebankruptcy past” to require inclusion in his bankruptcy estate, then a hypothetical post-bankruptcy gift from "Aunt Minnie” to compensate Burgess in hard times would also accrue to the estate. This analogy fails for three reasons. First, while Segal does not mandate a prepetition legally enforceable right, both Segal and its lower court progeny all exhibit an ultimate legal right plus facts rooted in the prebank-ruptcy past. A gift from Aunt Minnie, whatever its motive, does not belong to Burgess under any claim of right. Second, § 541(a)(5) brings within the debtor’s estate property acquired within six months postpetition by bequest, devise or inheritance. Gifts are similar to bequests but, because there is no mention of gifts in § 541(a)(5), must be presumed to have been excluded from the estate. Third, there is no theory of law under which a gift can be proceeds pursuant to § 541(a)(6).

. More will be said about "proceeds” later, as some states’ laws unequivocally so classify federal disaster payments.

. Another case often cited in this connection is Matter of Munger, 495 F.2d 511 (9th Cir.1974), which broadly and with common sense interpreted federal set aside payments as “proceeds” of sugar beet crops. Id. at 513.

. The majority asserts that the FarmPro court "reached the right result for the wrong reasons” and relies on the case's posture in bankruptcy, not discussed by the court, rather than on its own reasoning that held disaster payments includable in the debtor's estate as proceeds under § 541(a)(6) of lost crops by means of post bankruptcy legislation.

. Finova went on to conclude, however, that the U.C.C. does not create an independent cause of action for a secured party against third-party use of collateral. Finova, 774 So.2d at 1132.

. This definition formerly appeared at § 9:316 of the U.C.C. and was renumbered, without substantive change, when Article 9 was revised.

. This court in Rolling Plains Prod. Credit Ass'n v. Cook (In re Cook), 169 F.3d 271, 277 (5th Cir.1999) acknowledged the O’Briant holding that federal payments can be U.C.C. proceeds.

. This article comprehensively surveys state cases respecting disaster payments as proceeds. See also Boyd J. Peterson, Secured Transactions: Government Agricultural Payments as "Proceeds” of Agricultural Products under U.C.C. § 9-306, 79 A.L.R.4th 903 (1990).